KANE SIMONIAN *vs.* BOSTON REDEVELOPMENT AUTHORITY & another.

Suffolk.    April 5, 1961. — May 5, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Boston Redevelopment Authority.    Administrative Matter.    Mandamus.*

The Boston Redevelopment Authority, organized under G. L. c. 121, § 26QQ, as amended through St. 1957, c. 150, § 1, to engage in redevelopment projects in Boston was justified in making a reasonable rearrangement of its internal organization and reallocation of the offices, positions, and duties of its officers and employees by reason of the substantial expansion of its functions by St. 1960, c. 652.    [581]

Even if, following the substantial expansion of the functions of the Boston Redevelopment Authority by St. 1960, c. 652, a rearrangement in good faith by the Authority of its internal organization, whereby a new position of development administrator to be the chief executive of the Authority was created, a new employee was appointed to that position, and the person who had theretofore been the executive director of the Authority continued with the same formal title and without lowering of rank or compensation but was placed in charge of only one of several departments of the Authority and was to be under the supervision and direction of the development administrator, resulted in the executive director's being "transferred from the latest office or employment held by him without his consent" within G. L. c. 121, § 26QQ, as amended by St. 1958, c. 299, and such transfer was not made "in the manner provided by" G. L. c. 31, §§ 43, 45, there was "just cause" for such transfer, and a petition for a writ of mandamus by the executive director against the Authority seeking his restoration to his former status as its chief executive must be dismissed as a matter of discretion.    [582–584, 585–586]

PETITION for a writ of mandamus filed in the Supreme Judicial Court for the county of Suffolk on February 10, 1961.

The case was reserved and reported by *Williams, J.*, without decision.

*James W. Kelleher*, for Simonian.

*Edward J. Duggan & David W. Kelley*, (*John H. Doermann & George E. Donovan* with them,) for Boston Redevelopment Authority.

*Lewis H. Weinstein*, (*Herbert L. Berman* with him,) for Boston Redevelopment Authority and Logue.

*James J. Cody, Jr.*, for McCloskey, submitted a brief.

WHITTEMORE, J. The petitioner seeks a writ of mandamus to require the Boston Redevelopment Authority to restore him to his position of executive director as it existed under votes adopted in October, 1957, and to exclude Edward J. Logue from acting in that office under votes adopted on January 25, 1961. See *Kenney* v. *McDonough*, 315 Mass. 689, 692–693; *Farrell* v. *Mayor of Revere*, 306 Mass. 221, 223.

The authority was organized under G. L. c. 121, § 26QQ, as amended through St. 1957, c. 150, § 1. The general purpose set out in that section is to engage ''in urban renewal and land assembly and redevelopment projects.'' Such projects, it appears from definitions in § 26J, are, in general, for the acquisition of land within a decadent, substandard, or blighted open area and clearing the land, improving the site, and making the site available for redevelopment. General Laws c. 121A, in authorizing ''Urban Redevelopment Corporations,'' each for the purpose of undertaking a single project for renewal of a blighted open, decadent, or substandard area, affords a means for the construction of buildings on redevelopment sites. By c. 121, § 26QQ, read with § 26N, the authority is authorized to ''employ . . . an executive director who shall be ex-officio secretary of the . . . authority . . . and such other officers, agents and employees as it deems necessary or proper, . . . determine their qualifications, duties and

compensation, and . . . delegate to one or more of its members, agents or employees such powers and duties as it deems necessary or proper for the carrying out of any action determined upon by it."

The authority on October 27, 1957, shortly after its organization, adopted by-laws which prescribed among other officers an executive director, to be ex-officio secretary of the authority, with usual secretarial duties, and also to "have general supervision over the administration of the business and affairs of the Authority and . . . be charged with the direction of all projects and developments of the Authority, subject to the direction of the Authority. He shall, at the direction of, and with the approval of the Authority, employ necessary personnel and shall keep adequate records pertaining to all persons so employed. The Executive Director may sign all requisitions, forms, applications, and other transmittals to the Housing and Home Finance Agency and other public agencies in connection with the planning and execution of renewal projects."

The petitioner was employed as executive director, at a salary of $12,000, on December 11, 1957.

Statute 1958, c. 299, amended § 26QQ to provide, inter alia, "No person permanently employed by a redevelopment authority, who is not classified under chapter thirty-one, shall, after having actually performed the duties of his office or position for a period of six months, be discharged, removed, suspended, laid off, transferred from the latest office or employment held by him without his consent, lowered in rank or compensation, nor shall his office or position be abolished, except for just cause and in the manner provided by sections forty-three and forty-five of chapter thirty-one."

Statute 1960, c. 652, effective September 7, 1960, amended c. 121A (Urban Redevelopment Corporations) "with special provisions for projects in the city of Boston" and thereby gave substantial new powers and responsibilities to the Boston Redevelopment Authority. By § 12 it (1) transferred to the authority the powers and duties of the State

housing board under c. 121A in respect of projects in the city of Boston[1] and (2) established the authority as a planning board under G. L. c. 41, § 70, imposed upon it all the powers and duties of the city planning board of Boston,[2] which was abolished, and transferred to it all property, appropriations, and employees of the board, the employees being transferred "without reduction in their rank or compensation or impairment of their civil service rights, or their retirement rights, or their vacation, holiday or sick leave rights."

Immediately prior to September 7, 1960, thirty-four persons were employed by the city planning board, including the planning administrator, the planning director, the secretary of the planning board, who with most of the others had

---

[1] The powers and duties transferred from the State housing board to the authority include: (§ 3) authorization and approval of any project in Boston as the purpose of a newly forming Urban Redevelopment Corporation; (§§ 7, 7A, and 12) approvals with respect of financing, determination of valuation of real estate within the project, and approval of terms of acquisition of land from housing or redevelopment authority; (§ 8) inspection of construction; giving notice and instituting proceedings in the event of violations of requirements for construction, financing, or payment, or of applicable rules, etc.; (§ 9) determination, for dividend calculation, of consideration paid for stock; (§ 10) approval of stages of development of project; requesting of assessors the determination of maximum fair cash value of project or of any stage thereof; (§ 11) approval of taking of land under c. 79 or c. 80A and making of the award under G. L. c. 79, § 7; making rules and regulations for the corporations holding and managing land and buildings; (§ 15) approval of application of excess of gross receipts to reduction of indebtedness, or to renovating or improving the project, or to acquisition of additional property; (§ 16) issuance of a certificate that a corporation has carried out its obligations for forty years as a condition of accruing rights or privileges and obligations of a business corporation under G. L. c. 156; (§ 16A) giving certain approvals to successor in interest in event of foreclosure, etc.; (§ 18) agreement with insurance commissioner on fair rental value of space occupied by insurance company in a project undertaken under § 18; (§ 18B) issuing a certificate in respect of the formation of a corporation to take over a project and making supplementary determinations.

[2] General Laws c. 41, § 70, directs planning boards to make studies of and plans for the municipality. Ordinances of Boston, 1952, c. 4, § 3, as in effect September 7, 1960, calls for studies of resources, possibilities and needs of the city, and a master plan, with specification of many details to be covered by it. The office of planning administrator, transferred to the authority, had these functions: "Supervise the activities of the City Planning Department, its Director of City Planning and its consultants; recruits staff personnel; develops, frames, reviews, and recommends city planning policy, objectives, plans, programs, and procedures for the consideration of the City Planning Board; encourages and promotes the orderly development of the city by consultation, cooperation, and liaison with public and private groups as directed by the Board."

acquired civil service rights under G. L. c. 31. The yearly
salary of the planning administrator on September 7 was
$13,200. On January 25, 1961, by vote of the authority,
his salary was increased, retroactive to October 26, 1960, to
$18,000 per annum.

Immediately prior to September 7, 1960, the city planning
board was engaged, among other things, in planning activi-
ties for development, redevelopment, and improvement of
areas throughout the city of Boston and in the preparation
of studies, surveys, and other planning materials, in con-
nection with a proposed Government Center Project and a
proposed Washington Park Project, as well as a proposed
Boston Development Program, involving an estimated
aggregate cost of approximately $90,000,000 and including
ten general neighborhood renewal plans for areas within
the city.

Prior to September 7, 1960, there were forty-five em-
ployees of the authority. The authority has established no
numerical or alphabetical grades, ranks, or classifications
of employees. The yearly salary of the executive director
had been increased to $15,000 by October 26, 1960, and on
that date it was fixed at $18,000.

On October 20, 1960, at a regular meeting, with all five
members and Logue present, the authority adopted a re-
organization chart which, except for "General Counsel,"
showed the operations of the authority divided between a
development administrator and an executive director, each
directly under the authority. It assigned important rede-
velopment duties to the office of development administrator
and in other respects was much like the chart which became
the basis of the January 21, 1961, votes. On October 26,
1960, at a meeting attended by all members and the peti-
tioner and Logue, the October 20 minutes were unanimously
approved and Logue was appointed development adminis-
trator "for a ninety-day period in accordance with the
Table of Organization Chart adopted on 10/20/60 at an
annual salary of $25,000 . . . effective October 26, 1960."

On January 25, 1961, at a regular meeting of the author-

ity, with the same seven persons present, the authority adopted several votes. One of them referred to an organization chart which, as noted, was in many respects similar to the chart of October 20, 1960, but which showed the development administrator as the single top executive (with a deputy) directly under the authority, and placed the executive director in charge of an "Operations Dept." That department was under the development administrator, as were five other departments with these designations: "Planning Dept. Planning Administrator"; "Development Dept. Asst. Administrator for Development"; "Administrative Office"; "Legal Office"; and "Land Disposition Office." There were subordinate blocks and subblocks to show the ramifications of the planning department and of the development department particularly in respect of three "down town" and seven "community" projects. Subjoined to the "Operations Dept." block in the January, 1961, chart, but not in the October, 1960, chart, were two blocks entitled "West End" and "Whitney Street." Printed underneath the "Operations Dept." block were these designations: "Legal Comptroller Acquisition Family Business-Relocation Property Management Demolition Project Engineering." These designations except "Legal" were also listed under "Executive Director" in the October, 1960, chart.

The authority on January 25, 1961, voted (1) to establish a class of temporary development program employees; (2) "That the Development Administrator shall be employed on a non-permanent basis to serve as the chief administrative officer, under the direction and supervision of the Authority, and that the following powers and duties be delegated to . . . [him]." These are appropriate powers and duties for the chief executive of the organization.[3]

---

[3] The powers and duties of the development administrator are: "(1) Develop and carry out plans and program of the Authority, subject to appropriate review by the Authority; (2) Direction of and supervision of all members of the Authority staff provided that the Executive Director, acting as Secretary, shall be responsible to the Authority directly for the preparation of its minutes and the General Counsel shall be responsible directly to the Authority for legal opinions made at its request, both the Executive Director and General Counsel

The authority also voted (3) "That the Executive Director shall be the chief of the Operations Division and shall in that capacity be under the supervision and direction of the Development Administrator. As secretary of the Authority, the Executive Director shall keep the minutes of all meetings of the Authority and have custody of the seal of the Authority, and in that capacity shall report directly to the Authority"; (7) to appoint Logue as development administrator; (8) "That Kane Simonian shall be chief of the Operations Department with the title of Executive Director under the supervision and direction of the Development Administrator. The Executive Director shall be responsible for land acquisition activities, relocation of families and businesses, project engineering, site operations, property management, demolition, payroll and project accounting. He shall be responsible directly to the Authority for the completion of the West End . . . and Whitney Street projects, it being understood that for the purposes of Federal reporting in the West End Project, he shall be under the supervision and direction of the Development Administrator." The propositions in subdivisions (2), (3), (6), and (7) of vote numbered 2 (see footnote 3,

being subject to the supervision and direction of the Development Administrator for all other duties; (3) Internal organization of the Authority staff and functions, it being understood that no major changes will be made in the organization chart submitted December 21, 1960 (as modified by paragraph 2, above) without consultation with the Authority, the Authority reserving the right to disapprove such changes if it so desires; (4) As representative of the Authority, negotiate with officials of the Housing and Home Finance Agency, the Urban Renewal Administration, the Federal Housing Administration, the State Housing Board and such other Federal and state agencies as may be required to carry out the Development program; (5) Recruitment of staff personnel, subject to such recruitment policies as the Authority shall establish; (6) Establishment of staff compensation, subject to Authority approval, it being understood that, so long as the Development Administrator shall be serving hereunder, changes shall not be made in staff compensation unless recommended by the Development Administrator and approved by the Authority; (7) Appointment, suspension and removal of all personnel, counsel and consultants and all parties engaged to perform personal services for the Authority, subject to Authority approval, it being understood that, so long as the Development Administrator shall be serving hereunder, appointments, suspensions or removals shall not be made unless recommended by the Development Administrator and approved by the Authority, it being understood that the Development Administrator shall not have the power to recommend suspension or removal of Authority employees having the benefits of the tenure law, section 26QQ, Chapter 121, and presently employed by the Authority, except for cause. (8) Coordination with the Mayor and City Departments."

*supra*), and all of votes 3 and 8, were carried by three affirmative votes, two members dissenting on "grounds of illegality." The other votes were unanimously adopted. The minutes of January 25, 1961, were approved at the regular meeting on February 1, 1961, at which the petitioner and Logue were present.

We meet at the threshold the question whether the latest "office or employment" of the petitioner for purposes of determining the validity of the January, 1961, action under St. 1958, c. 299, was that fixed by action of the authority in October, 1960, rather than the "office or employment" assigned by the 1957 votes. The October action was, we infer, known to the petitioner for he attended the meeting of October 26, 1960, at which the October 20 minutes were read. At the October 26 meeting it was voted, in addition to the action set out above, that "the Executive Director instruct every member of the Authority staff to give complete co-operation in every respect to the Development Administrator, Mr. Edward J. Logue." There is nothing to indicate that the October organizational chart was a temporary expedient or that if Logue was not employed beyond the ninety day period the form of organization would revert. The reasonable inference is to the contrary. There is some basis for the inference that the reassignment of duties in October, 1960, was with the petitioner's consent, notwithstanding the temporary term of Logue's employment. There is no suggestion of his opposition. An inference is warranted of the petitioner's coöperation to make the new organization effective at least for ninety days. The tenure statute does not require written consent, and an order for the restoration of office under G. L. c. 31, § 46A, as appearing in St. 1959, c. 569, § 5, must be sought within seven days after the "action has been taken." On the other hand the preceding paragraph of § 46A fixes the time limit for petitioning for mandamus at six months unless the court for cause shown extends it.[4] In the circum-

---

[4] Quaere: whether c. 31, § 46A, is applicable for St. 1958, c. 299, refers only to §§ 43 and 45.

stances, including particularly the temporary aspect of Logue's employment, we reserve the point, and resolve the case on a more fundamental issue.

Tenure status of employees under such statutes as St. 1958, c. 299, is related primarily to pay, title, and formal rank. Substantial changes in the duties of employees may be made in due course without affecting such status. See *Tremp* v. *Patten*, 132 Conn. 120, 127–128 (police lieutenant); *Wesenberg Case*, 346 Pa. 438 (school principal); *Pittsburg Sch. Dist. Appeal*, 356 Pa. 282 (school teacher). There may be greater scope for such changes in respect of high executive posts than for lower ranks. In any event St. 1960, c. 652, enacted a material expansion of the statutory mandate of the authority and was adequate justification for its internal reorganization with incidental albeit substantial effect upon the duties of employees, particularly those in key positions. Such an effect is a reflection of the general legislative action to which the protection of the tenure statute must yield. See *Reynolds* v. *McDermott*, 264 Mass. 158, 165; *Alger* v. *Justice of the Dist. Court of Brockton*, 283 Mass. 596, 600; *Selectmen of Milton* v. *Justice of the Dist. Court of E. Norfolk*, 286 Mass. 1; *McNeil* v. *Mayor & City Council of Peabody*, 297 Mass. 499, 503–504; *Fortin* v. *Chicopee*, 301 Mass. 447, 449.

The reorganization which was in substantial part accomplished in October, 1960, and completed in January, 1961, on the basis of the "chart submitted December 21, 1960 (as modified by paragraph 2)" of vote 2 passed on January 25, 1961 (see footnote 3, *supra*), shows a reasonable adjustment of offices, positions, and responsibilities to the enlarged functions of the authority. It was necessary to have a planning department; it was suitable to divide the development activities between a "Development Dept." concerned with "Federal Processing," "Rehabilitation," "Downtown Renewal" and "Community Renewal" and an operations department concerned with other aspects of the task of redevelopment; the three other more specialized staff offices, "Administrative," "Legal" and "Land Disposition," were suitable to the enlarged enterprise.

Such rights as the petitioner has under St. 1958, c. 299, stem, we think, from the failure to assign to him chief executive duties under the plan in January, 1961, rather than the adoption of that plan by successive stages over the preceding three months.

In important respects the petitioner's employment status is unimpaired by the new assignment. His pay has been increased; his formal title is unchanged and the only duty of the office prescribed by statute continues. A "freeze-in" or tenure statute is more surely appropriate in its detail, and perhaps, indeed, in its intent, to lower level employees than to the few executives entrusted with the direction of a great enterprise. The meaning of "rank" as applied to the petitioner and his high level colleagues is not certain. We think, however, that the appointment of a top executive above both the newly installed executive in charge of planning and the executive in charge of development would not require the conclusion of lower rank for either. Compare *Smith* v. *Director of the Dept. of Pub. Safety of Lawrence,* 290 Mass. 307; *Kelley* v. *School Comm. of Watertown,* 330 Mass. 150.

The petitioner, however, contends that he not only lost rank but was in all events transferred from his office. It was the essence, he asserts, of his "latest office or employment" as described in the by-laws and as implied in the statutory title "executive director" that he be the executive in charge of development activities and personnel as well as chief executive of the authority, and that with the transfer of those essential redevelopment duties along with the transfer of overall executive control to the redevelopment administrator there was in effect a transfer of the office which had been his, and this, taken with the failure to transfer the petitioner with the office, effectually transferred him to the office of head of "operations." We assume, without deciding, that this is so and that it was beyond the scope of the reassignment of duties incident upon the enactment of St. 1960, c. 652, which could be made without regard to St. 1958, c. 299. See *Jantzen* v. *School*

*Comm. of Chelmsford,* 332 Mass. 175, 177. It does not follow, however, that a writ of mandamus should issue.

The crucial question is whether the decision of the authority that a new employee should occupy the new or enlarged office of chief executive of the expanded authority was itself "just cause" for making whatever transfer of offices was involved. If the authority's decision of the matter is not conclusive then, in addition to the issue, when present, of pretence or sham, the issue of the employee's competence must be the subject of the employee's hearing before the authority and must be tried before the civil service commission and reviewed by the District Court. We hold that this is beyond the intent of St. 1958, c. 299, at least in respect of the choice of the top executive of such an agency as the authority after it has been reconstituted with materially enlarged powers and duties. No one but the authority which alone has the statutory responsibility for the success of its task can determine what employee or employees have the unusual attributes which will furnish effective direction and attain success.[5] We need not decide how far a great public agency is committed by an original appointment and a tenure statute to continue a chief executive in an unchanged office unless it can prove to others the desirability of a change. In any event, there having been no implication in the original appointment of the petitioner to the position of executive director of the pre-1960 authority that he was fitted to the task of chief executive of the new enterprise, the authority could not be called upon to prove the contrary. *Jantzen* v. *School Comm. of Chelmsford,* 332 Mass. 175, 177.

It follows that exercise of the right to notice and a hearing would bring no substantive issue before the authority, the commission and the court, in the absence of a contention that the authority's action was only a pretence to cover

---

[5] Something of the scope of what the authority must do is indicated by the number and title of the projects shown on the chart: Downtown North; Downtown; Back Bay; West End; Whitney Street; Roxbury-North Dorchester; Charlestown; South End; Parker Hill; South Boston; East Boston; Jamaica Plain. The indication is of a general redevelopment of the City of Boston.

improper motives. There is no express statement about this in the agreed facts. But the parties have stipulated that the court "may draw any inference it shall deem warrantable from the facts agreed upon and hereinbefore set forth." Although absence of bad intent on the part of the authority would not lessen the petitioner's right to notice and a hearing, it is relevant to the exercise of the discretion to issue a writ of mandamus. Because of this, and the absence of any allegation suggesting such a contention, and because of the implications of the recorded action in a matter of such moment, we infer that the January 25, 1961, action of the authority was not a subterfuge and that it resulted solely from the decision that Logue was the best available man to head the authority's full time staff. We recognize that the adoption of the reorganization plan was entwined with the proposed appointment of Logue. It is perhaps inferable indeed that details of the plan may have been formulated to fit the capabilities and requirements of Logue or others. But we discern no aspect of pretence, sham, or improper motive in this.

It follows that the issues which would be tried if notice was given, hearings held, and review had under the statute are now resolved. The case is somewhat similar to *Jantzen* v. *School Comm. of Chelmsford*, 332 Mass. 175, *supra.* In that case the school committee had transferred to a new and larger school the pupils of the school of which the petitioner had been principal and had assigned the petitioner to teach in the new school "in the grade most suitable to her with no reduction in salary." She sought to be recognized as the principal of the new school and to require that the committee refrain from "demoting" her. The dismissal of her petition for a writ of mandamus as a matter of discretion was upheld. The opinion by Qua, C.J., assumed without deciding that the petitioner was demoted and that the proposal to discontinue the petitioner's school required a "charge" of "cause" upon which a hearing could be had. "She may have had a technical right to notice and a hearing, but she had no right

to be appointed principal of the new school. That was
not the position she had previously held. . . . It was the
duty of the school committee in the interest of the public
to select the person for that position whom they judged
best fitted for it. If the petitioner had had a hearing
. . . [i]n the last analysis it would have come down to
the question whether the closing of her school, which was
the cause of her losing her position, was a reality and not a
pretence or sham. That question has now been settled
beyond any possible doubt. The school committee unques-
tionably had power to close the . . . [s]chool. . . . The
court will not issue its writ to require a hearing which it
can see must be futile. . . ."

The case of *Cullen* v. *Mayor of Newton*, 308 Mass. 578, is
not a precedent in respect of the exercise of discretion.
There the single justice had dismissed the petition for a
writ of mandamus as a matter of law and the petitioner's
exceptions prevailed on the law point. The holding was
that absence of written notice and hearing under c. 31,
§ 42A, invalidated an ordinance which purported to abolish
a single office in the police department as a measure of
economy even if passed in good faith. In this case the
formal conflict with the tenure statute, if it existed, was
only at the point of failure to put the petitioner into the
newly constituted position of chief executive rather than in
the adoption of the reorganization plan. The interdepend-
ence of the several steps which culminated in the January,
1961, votes does not make the adoption of the reorganiza-
tion plan a nullity. Also, where the issue, as in the *Cullen*
case, is entire loss of employment, or a serious derogation
of the usual criteria of employment status, there are rea-
sons not here present why discretion should not be exer-
cised to deprive a petitioner of any rights even though they
appear to be only formal.

The petitioner retains all the attributes of his post which
are consistent with the decision to make the change in top
command and, judged only by an important measure, com-
pensation, his employment status has been increased. The

action of the authority conforms to the general intent of St. 1958, c. 299, if not the letter, and is action which must be final with the authority, for otherwise the specific intent of G. L. c. 121 as applied to Boston and St. 1960, c. 652, will be impeded or thwarted. In the circumstances we decline to order the issuance of the writ.

It appears by the agreed facts, supplemented by stipulation of counsel at the argument, that the petitioner had rights as a veteran under the first paragraph of St. 1958, c. 299. This provides that a veteran, as described, having held his "office or position for not less than three years, shall not be involuntarily separated . . . [therefrom] except subject to and in accordance with . . . [G. L. c. 31, §§ 43 and 45] to the same extent as if said office or position were classified under said chapter." This gave no additional rights beyond those we have discussed.

The informalities involved in the failure of the authority to amend its by-laws and in other respects in the adoption of the new organization plan are not adequate reasons for the writ to issue.

*Petition dismissed.*