ABRAHAM MOSKOW & others[1] *vs.* BOSTON REDEVELOPMENT
AUTHORITY & others
(and four companion cases[2]).

Suffolk.   April 9, 1965. — August 17, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Eminent Domain,* Validity of taking, Purpose of taking, Motive of taking,
Redevelopment authority.   *Urban Renewal.   Redevelopment of Land.
Boston Redevelopment Authority.   Administrative Matter.   Political
Matter.   Public Board.   Equity Pleading and Practice,* Parties, Declar-
atory proceeding, Bill, Demurrer.   *Agency,* Scope of authority or em-
ployment.   *Elections.   Public Officer.   Conflict of Interest.   Certiorari.
State Administrative Procedure Act.   Words,* "Coerce," "Threatened."

In a suit in equity under G. L. c. 231A against a redevelopment authority
and a bank by owners of an office building for a declaratory decree
that a taking of the building by eminent domain by the Authority osten-
sibly for an urban renewal project was invalid, an interlocutory decree
rightly sustained the bank's demurrer to the bill on the ground that
under § 8 the bank did not "have or claim any interest which would be
affected by the declaration" where, although the bill alleged in substance
that, in view of a prospective taking of a nearby building of the bank
for the project, an arrangement was made between the bank and the
Authority whereby the plaintiffs' property would also be taken, their
building demolished, and their land turned over to a developer for erec-
tion thereon of a new building in which the bank would become a tenant,
thus enabling the bank to continue business in the area, the bill also
alleged that the controversy was between the plaintiffs and the Author-
ity and did not allege any contractual right of the bank or any facts
showing that as a prospective tenant of the new building the bank was
in any different legal position from that of any other prospective tenant
thereof [561]; KIRK and SPIEGEL, JJ. dissenting.

[1] Jay I. Moskow, Harry Moskow, and Myer Moskow.

[2] The companion cases are all by State Street Corporation:   No. 13,348,
certiorari against City Council of Boston; No. 13,349, certiorari against John
J. Carney, temporary Director of Division of Urban and Industrial Renewal,
and Boston Redevelopment Authority; No. 6622, bill in equity against City
Council of Boston, Boston Redevelopment Authority, New England Merchants
National Bank of Boston, and Andrew A. Hunter; and No. 6623, petition for
review under G. L. c. 30A, § 14, against the Division of Urban and Industrial
Renewal.

Moskow *v.* Boston Redevelopment Authority.

In a suit in equity under G. L. c. 231A against the redevelopment authority of a city, the city council, and the political campaign agent of two of the city councillors by owners of an office building for a declaratory decree that a taking of the building by eminent domain by the Authority following approval of an urban renewal plan by the city council was invalid, an interlocutory decree rightly sustained the agent's demurrer to the bill on the ground that under § 8 the agent did not "have or claim any interest which would be affected by the declaration" where as to the agent the bill merely alleged that preceding the approval the plan had been a political issue in a city council election and that after the election the agent had sent each of his principals a check for his share of the unexpended surplus of campaign contributions.   [561]

In a suit in equity for a declaratory decree under G. L. c. 231A that a taking by eminent domain by a redevelopment authority for an urban renewal project was invalid, allegations in the bill that the property taken was not within a decadent, substandard, or blighted open area and that the Authority had no power to take the property on such grounds must be disregarded.   [561]

Upon appeal from decrees sustaining a demurrer and dismissing the bill in a suit in equity under G. L. c. 231A by the owners of an office building against a redevelopment authority seeking a declaratory decree that a taking of the building by the Authority was invalid, the decrees should be reversed and a decree entered declaring that the taking was not invalid where the bill principally alleged that the "primary purpose of the taking . . . was not the public interest but was to provide a site for a new private office building to be occupied by" a certain bank, that the taking was made "ostensibly in connection with" an urban renewal project, that the Authority had originally proposed to widen a nearby street bordering a building of the bank in which it had its principal office and to take and demolish the bank's building, that the bank initially vigorously protested but that later, after negotiations among "representatives" of the bank, of the Authority, and of a developer selected by the bank, an "understanding" was reached that the bank would withdraw its protest and that, after either a sale of the plaintiffs' property to the bank or a taking thereof by the Authority and transfer thereof to the developer, the plaintiffs' building would be demolished and a new building would be erected by the developer on the same site for partial occupancy by the bank, that until completion of the new building the bank could occupy its former building, that the purpose of the understanding was to "coerce" the plaintiffs to sell their property to the bank, that the Authority's administrator "threatened" the plaintiffs, that they were unwilling to sell, that the administrator, pursuant to the understanding, prepared an urban renewal plan including both the plaintiffs' and the bank's properties and the erection of the new building, and that the Authority then voted to approve the plan [562–564]; KIRK and SPIEGEL, JJ., dissenting.

On demurrer, it was not to be inferred from the allegations of a certain bill in equity that a redevelopment authority was bound by various acts and statements attributed to its administrator and to unidentified "representatives" of it [563, 564]; KIRK and SPIEGEL, JJ. dissenting.

Moskow *v*. Boston Redevelopment Authority.

An approval by a city council of the plan of an urban renewal project under G. L. c. 121, § 26ZZ, after due notice and a public hearing was not invalid because of the facts that the hearing was not conducted like a court hearing, that the council had twice previously voted to disapprove the plan, that members of the council had expressed opinions or taken sides on the merits of the plan during an election campaign or at other times, that two of the councillors were beneficiaries of campaign fund contributions related to the issue and received their share of the unexpended funds after the election, and that an unnamed member of another councillor's family "was conducting a funeral home in premises located in the [project] Area . . . and seeking to relocate his business within the Area." [564–566, 567]

Political campaign contributions do not fall within the prohibitions of G. L. c. 268A, §§ 3 and 17, as appearing in St. 1962, c. 779, § 1. [566–567]

A contention that the plan for an urban renewal project in Boston was invalid because the plan did not conform to a general plan for the municipality as a whole and was not sufficiently complete to indicate zoning and planning changes as required by G. L. c. 121, § 26ZZ, was without merit where it appeared that no general plan for Boston as a whole existed and that the plan showed an intention to erect a structure "not . . . less than 360 feet in height" whereas "the existing zoning . . . impose[d] a maximum [height] limitation of 155 feet." [567–569]

An urban renewal project subject to G. L. c. 121, § 26ZZ, as amended through St. 1960, c. 776, § 7, was not subject to § 26KK, and the owners of property taken by eminent domain for the project had no right to a hearing by the then Division of Urban and Industrial Renewal prior to its approval of the project plan. [569–570]

Action by a city council approving the plan for an urban renewal project pursuant to G. L. c. 121, § 26ZZ, was political and was not subject to judicial review as to the merits by certiorari. [570]

A decision by the then Division of Urban and Industrial Renewal approving the plan for an urban renewal project pursuant to G. L. c. 121, § 26ZZ, was not "in an adjudicatory proceeding" as defined in G. L. c. 30A, § 1 (1), and was not subject to judicial review under § 14 of c. 30A. [571]

Certiorari did not lie to review on the merits a decision by the then Division of Urban and Industrial Renewal approving the plan for an urban renewal project under G. L. c. 121, § 26ZZ. [571–572]

Two BILLS IN EQUITY filed in the Superior Court on June 9, 1964, and September 11, 1964, respectively.

Two PETITIONS for writs of certiorari filed in that court on June 9, 1964, and July 13, 1964, respectively.

PETITION for review filed in that court on July 13, 1964.

The cases were heard by *Cahill*, J., on demurrers.

*Claude B. Cross* (*John M. Reed* with him) for Abraham Moskow & others.

*Richard Wait* for the New England Merchants National Bank of Boston.

*Jason A. Aisner* for Andrew A. Hunter.

*William H. Kerr* for the City of Boston & another.

*David Berman,* Assistant Attorney General, for the Director of the Division of Urban and Industrial Renewal & another.

*Lewis H. Weinstein* (*Verne W. Vance, Jr.,* with him) for Boston Redevelopment Authority.

WILKINS, C.J.

THE PRINCIPAL BILL FOR DECLARATORY RELIEF.

The plaintiffs own as tenants in common a parcel of land with an office building at 10 State Street, Boston, title to which they acquired on July 23, 1964, from State Street Corporation (State Street), a corporation of Massachusetts, of which they were the sole stockholders, and which on that date they voted to liquidate and dissolve. Also on that date, shortly after the deed to the plaintiffs was recorded, the defendant Boston Redevelopment Authority, a body corporate and politic established under G. L. c. 121, § 26QQ (as amended by St. 1957, c. 150, § 1) and given powers and duties unique for a redevelopment authority by St. 1960, c. 652, §§ 12–14, voted to take the property. The plaintiffs contend the taking to be invalid and bring this bill in equity pursuant to G. L. c. 231A for a declaratory decree and for injunctive relief.[1] The controversy alleged is between the plaintiffs and the Authority. The defendants city of Boston, the city council, the Division of Urban and Industrial Renewal,[2] and John J. Carney, its "temporary" director, are made defendants allegedly because of G. L. c. 231A, § 8.

---

[1] Case No. 6624.

[2] As of August 6, 1964, the name of the Division was changed to the Division of Urban Renewal, and the Division was placed in the Department of Commerce and Development of the Commonwealth. G. L. c. 121, § 26J, as amended by St. 1964, c. 636, § 6. Previously the name of the Division was the Division of Urban and Industrial Renewal, and the Division was located in the Department of Public Welfare. See St. 1960, c. 776, §§ 1, 2.

Also made defendants are New England Merchants National Bank of Boston, having a usual place of business at 28 State Street, and Andrew A. Hunter "because of their interest in the proceedings." All the defendants filed demurrers. These were five in number: (1) by the Authority; (2) by the city and the city council; (3) by the Division and Carney; (4) by the bank; (5) by Hunter.

The plaintiffs appealed from interlocutory decrees sustaining the demurrers and from a final decree dismissing the bill.

We summarize the factual allegations of the bill. The primary purpose of the taking was not the public interest but was to provide a site for a new private office building to be occupied by the bank. The taking was made ostensibly in connection with a redevelopment project of the Authority, known as the Government Center Project (the Project), under the powers conferred by G. L. c. 121. Neither the property at 28 State Street nor that at 10 State Street was within a decadent, substandard, or blighted open area within the meaning of c. 121, and the Authority had no power to take those properties on the ground that they were within such areas. The Authority, however, proposed to widen and reconstruct Congress Street on which the bank's building bounded, so as to facilitate access to the Project and to take the bank's property for that purpose. The bank, which had had its principal office on State Street for many years, vigorously protested this proposal on various grounds, among them, that its property was not within a decadent, substandard, or blighted area, and that it was not necessary to take its property to widen Congress Street. After negotiations among representatives of the bank, of the Authority, and of Cabot, Cabot & Forbes Company (Cabot), a developer selected by the bank, an understanding was reached that the bank would withdraw its objections and would endeavor to purchase the property at 10 State Street from State Street; that if the bank should be able to make the purchase, it would cause the existing building at 10 State Street to be demolished and the land to be con-

veyed to Cabot, which would erect upon the site a new tower building of a design and specifications approved by the bank and the Authority, and would lease the first ten floors to the bank; that in that case the bank would sell its property at 28 State Street to the Authority at the fair value, retaining the right to possession until the new building should be completed and ready for occupancy; that if the bank should be unable to purchase the property at 10 State Street upon acceptable terms, the Authority would include both that and the bank's property in the area which it proposed to take for the Project, and would dispose of it to Cabot upon terms satisfactory to Cabot; that Cabot would then proceed to construct the new tower building to be occupied by the bank; but that until the new building should be ready for occupancy, the bank and its tenants might continue to occupy the premises at 28 State Street. The purpose of the understanding was to "coerce" State Street to sell its property to the bank so that the latter might continue to maintain its principal offices on State Street. To effect that purpose, the administrator of the Authority "threatened" the officers of State Street that unless it sold to the bank, he would cause it to be included in the urban renewal plan for the Project, and to be taken by the Authority by eminent domain.

State Street was unwilling to sell to the bank at the price which the bank offered. Accordingly, the administrator of the Authority, pursuant to the understanding set forth above, caused an Urban Renewal Plan to be prepared which included both the property of the bank and that of State Street. These properties were designated on the Plan as Parcel 8, and the specifications of land uses required that a tower building conforming generally to the specifications previously approved by the bank, the Authority, and Cabot be erected thereon. On April 2, 1963, the Authority gave notice of a hearing upon the proposed plan to be held on April 17, 1963. On June 5, 1963, the Authority voted to approve the Plan.

The Authority first submitted the Plan to the city council for approval in June, 1963. On July 22, 1963, after a pub-

lic hearing at which State Street appeared by counsel, the Committee on Urban Redevelopment, Rehabilitation, and Renewal of the city council reported that a majority of the committee were in favor of the Project with the boundaries which had been earlier defined, but were opposed to the inclusion of Parcel 8. Thereupon the council rejected the Plan by a vote of five to four. On July 29, 1963, the council again voted to reject the Plan.

During August, September, and October, 1963, the mayor and others, including a director of the bank, attempted to make the approval of the Plan a political issue in the November election of members of the city council. The director headed a group which recommended a slate pledged to vote for approval of the Plan including Parcel 8 and solicited campaign contributions to promote their election. George F. Foley and Barry Hynes were on that slate. Frederick C. Langone publicly pledged his support before the election. None of the three had heard the evidence introduced in the hearings before the council. On or about November 18, 1963, after the election the defendant Hunter sent George F. Foley and Barry Hynes each a check for $29 as his share of the unexpended surplus of contributions received as their agent.

On April 13, 1964, the mayor resubmitted the Plan to the city council. On May 7, 8, 12, and 13, 1964, the council held hearings on the Plan at which the plaintiffs' counsel appeared and proposed objections to the approval of the Plan including Parcel 8. The plaintiffs' counsel suggested that Foley, Hynes, and Langone be disqualified on the ground that they had publicly pledged themselves during the campaign, and Foley and Hynes on the additional ground that they had received compensation for their pledges. During the hearing the plaintiffs' counsel requested Langone to disqualify himself on the additional ground that a member of his immediate family had a financial interest in the Project in that such member was conducting a funeral home in the area, paying rent, and seeking to relocate in the area. All three declined to disqualify themselves and were in the

majority on May 25, 1964, when the council approved the Plan by a vote of five to four.

At the hearing the plaintiffs' counsel requested permission to cross-examine witnesses and to call other witnesses on the ground that the proceedings were quasi judicial and that due process required this as a matter of right. The council refused such permission, ruling that the proceedings were legislative and not quasi judicial. At the hearing the plaintiffs also objected to the council reconsidering the Plan including Parcel 8 on the ground that it had been twice submitted and rejected in 1963 with finality, that it was again submitted without modification or other action by the Authority, and that the determinations of fact made by the council in 1963 were res judicata and not to be set aside by members of the council thereafter elected. On May 25, 1964, the council by a vote of five to four approved the Plan including Parcel 8.

On May 26, 1964, the Authority submitted the Plan to the Division of Urban and Industrial Renewal for approval. On June 12, 1964, at the request of more than twenty-five taxable inhabitants of Boston, the Division held a public hearing at which State Street appeared by counsel. Although the proceeding was one in which State Street was directly involved and there were issues of fact upon which State Street had a constitutional right to be heard, the Division by its temporary director, Carney, denied State Street a fair hearing and refused to permit it to intervene, or to call and examine or to cross-examine witnesses, and to issue subpoenas in the name of the Division, all on the ground that the hearing was legislative and not adjudicatory or quasi judicial.

The plaintiffs' bill further alleges that the Plan submitted by the Authority was invalid and should not have been approved because it did not conform to a general plan for the municipality as a whole and was not sufficiently complete to indicate zoning and planning changes as required by G. L. c. 121, § 26ZZ. There is no general plan for Boston as a whole. The specifications in the Plan for the use

of Parcel 8 violate the "zoning ordinances" of Boston, but the Plan does not indicate the changes in the "ordinances" required.

1. At the outset we shall eliminate two defendants whose presence in the discussion is unnecessary. Their demurrers were rightly sustained.

(a) The first is the bank. It will be recalled that it is alleged that the controversy is between the plaintiffs and the Authority. The bank may be more than an interested bystander, but it does not have the kind of interest referred to in G. L. c. 231A, § 8 (inserted by St. 1945, c. 582, § 1). In other words, it does not "have or claim any interest which would be affected by the declaration." No contractual right is alleged, and, as to the controversy, the bank is in no different legal position from that of any other prospective tenant.

(b) The second is Hunter, who has no interest whatsoever to be affected by the declaration. His only connection is extremely indirect through two members of the city council, who, as later appears, were not disqualified from voting. His claim for counsel fees we leave to application to the court below, should he be so advised.

2. We next consider certain issues raised by allegations of the bill which have been the subject of decisions of this court. No attention can be paid to the allegations that the property at 10 and 28 State Street is not within a decadent, substandard, or blighted open area and that the Authority had no power to take on such grounds. Courts are not authorized to second guess the Authority in such respects. The allegations, moreover, do not mean that the public bodies designated by statute might not reasonably adjudge otherwise. *Stockus* v. *Boston Housing Authy.* 304 Mass. 507, 509–510. *Bowker* v. *Worcester,* 334 Mass. 422, 434. *Worcester Knitting Realty Co.* v. *Worcester Housing Authy.* 335 Mass. 19, 22. See *St. Luke's Hosp.* v. *Labor Relations Commn.* 320 Mass. 467, 470; *Electronics Corp. of America* v. *City Council of Cambridge,* 348 Mass. 563, 568.

Nothing is added to the plaintiffs' case by such words of belligerence as "coerce" and "threatened." *Fleming* v. *Dane,* 298 Mass. 216, 218. *DeVincent Ford Sales, Inc.* v. *First Mass. Corp.* 336 Mass. 448, 452. Restatement: Torts, § 783, comment a. See dissent of Holmes, J., in *Vegelahn* v. *Guntner,* 167 Mass. 92, 107.

The bill contains an allegation that the Authority originally intended to take the bank property at 28 State Street to widen and reconstruct Congress Street so as to facilitate access to the Project area, but does not allege that there was a similar intention as to the plaintiffs' property at 10 State Street. If the latter property had been included in Parcel 8, it is not denied that it could have been properly so taken, and that the determination of the boundaries of the area was a matter exclusively for the Authority and not subject to judicial review. *Worcester Knitting Realty Co.* v. *Worcester Housing Authy., supra,* 22.

The plaintiffs' case is epitomized in the allegations: "The primary purpose of the taking of the plaintiffs' land was not the public interest, but was to provide a site for a new private office building to be occupied by the defendant bank. The taking was made ostensibly in connection with a redevelopment project of the Authority, now known as the Government Center Project . . . ." This charge must be read with the remainder of the bill in order to determine whether there are sufficient allegations of specific facts to be good on demurrer. These characterizations may be construed as a backhanded way of generalizing that the principal purpose was not public, but such rhetoric is not an adequate substitution for allegations, with adequate specification of facts, that the Project with 10 State Street included in Parcel 8 was not for a public purpose. A most significant omission is any allegation that the members of the Authority were to the least extent involved in any negotiations with the bank or had authorized them or even knew about them. Everything is charged against the administrator. To the extent disclosed by the bill, the vote of the Authority adopting the Project was proper and entirely legal.

The case does not fall within the illustration in *Despatchers' Cafe Inc.* v. *Somerville Housing Authy.* 332 Mass. 259, 263, which reads: "It is perhaps possible to imagine a case where the authorities ostensibly taking land for a schoolhouse have no intention of building any schoolhouse at all but are really taking the land to let it lie open for the benefit of adjoining land owned by themselves or for some other irrelevant purpose." The Authority here has voted to take the property for the Government Center Project, and intends to continue to carry out that project. The sole reason apparent for delay is the pendency of litigation. Nothing in *Village on the Hill, Inc.* v. *Massachusetts Turnpike Authy.* 348 Mass. 107, in the least degree relaxes the strictures imposed in *Despatchers' Cafe Inc.* v. *Somerville Housing Authy.* 332 Mass. 259, against "attacking merely the impelling motives of officers authorized to exercise the power of eminent domain and actually exercising that power for authorized purposes" (page 264). The *Village on the Hill* case was tried on the merits.

In order to make a case against the Authority from the allegations of the bill it would be necessary to assume that the administrator was authorized to do and say everything alleged and to assess the Authority with full accountability for the acts and statements attributed to the administrator because he was its chief administrative officer. See *Simonian* v. *Boston Redevelopment Authy.* 342 Mass. 573, 578n–579.

"No intendment in favor of the pleader can be made upon a demurrer. It admits allegations of fact well pleaded but does not admit inferences from such facts unless they are necessary inferences. It does not admit conclusions of law from facts averred. *Comerford* v. *Meier,* 302 Mass. 398, 402, and cases cited." *Walter* v. *McCarvel,* 309 Mass. 260, 263–264. These are well established principles of very long standing and have been frequently declared. *Dealtry* v. *Selectmen of Watertown,* 279 Mass. 22, 27. *Stockus* v. *Boston Housing Authy.* 304 Mass. 507, 510–512. *Foster* v. *Shubert Holding Co.* 316 Mass. 470, 474. *Matek* v. *Matek,*

318 Mass. 677, 679. *Cabot* v. *Assessors of Boston,* 335 Mass. 53, 58. *James Constr. Co. Inc.* v. *Commissioner of Pub. Health,* 336 Mass. 143, 146. *Joyce* v. *Hickey,* 337 Mass. 118, 123. *J. J. Gordon, Inc.* v. *Worcester Telegram Publishing Co. Inc.* 343 Mass. 142, 143. *Weinstein* v. *Chief of Police of Fall River,* 344 Mass. 314, 317. *Harrington* v. *Worcester,* 345 Mass. 166, 167–168.

There is set forth no adequate specification of facts to substantiate other generalities of the bill. None is found in the bank's protest against the taking of its property. The negotiations said to have taken place among representatives of the bank, of the Authority, and of Cabot do not identify the representatives of anyone, and of the Authority in particular. We cannot supply an allegation that any representatives were authorized to bind the Authority to such an "understanding" which the plaintiffs insist was improper. We do not construe these allegations as meaning that any member of the Authority was such a representative. We infer that none was. Even if one or more members of the Authority had been present, it could not avail the plaintiffs. The members comprise a board of public officers, who must make official decisions, such as are involved in a taking of land, by at least a majority vote given at a duly constituted meeting of the board. They could not act separately or individually. *Alphen* v. *Shadman,* 330 Mass. 608, 609.

Wrung dry of broad generalities, all that is left of the bill of complaint on the point presently considered is a discussion by "representatives" of three parties followed by an "understanding" which led to the inclusion of 10 State Street in the Project area.

On this point this is the opinion of a majority of the court.

3. We next pass to numerous miscellaneous objections of the plaintiffs to the approval of the Plan (a) by the city council and (b) by the Division.

"Urban renewal projects shall be planned, undertaken and carried out in a city or town by the redevelopment au-

thority thereof . . . ." G. L. c. 121, § 26YY (inserted by St. 1955, c. 654, § 4). "No urban renewal project shall be undertaken until the urban renewal plan therefor has been submitted to, and approved by, the division of urban and industrial renewal; and no urban renewal plan shall be submitted to the division of urban and industrial renewal unless the same has been approved . . . by the mayor with the approval of the city council . . . after· due notice and a public hearing." G. L. c. 121, § 26ZZ (as amended through St. 1960, c. 776, § 7).

The statute does not indicate that the function of the city council was meant to be in any sense like that of a court, but rather makes the requirement that the mayor and the council, who are elected, give their sanction to a project initiated by the Authority, all of whose members were appointed.[1] There is nothing in § 26ZZ to show that the Legislature intended a council hearing to resemble one in court with absolute rights of examination and cross-examination. Statements at such a hearing were not evidence. See, generally, Sullivan, Administrative Procedure and the Advocatory Process in Urban Redevelopment, 45 Cal. L. Rev. 134, 143–144. The earlier votes of the council were not res judicata, and could not prevent action by another council later elected. One might as well contend that a Legislature lacked power to vote to take some action which had been voted down by a previous Legislature.

No member of the city council was disqualified because he had expressed an opinion or taken sides on the merits of the Plan including Parcel 8 whether during an election campaign or at any other time. This rule applies equally to those voting in favor as well as to those opposed. The issue was wholly political in character. *Hayeck* v. *Metropolitan Dist. Commn.* 335 Mass. 372, 375, and cases cited. It was likewise one of great interest in the community, and the voters were entitled to know the views of the candidates, who had a right, and perhaps a duty, to state their

---

[1] G. L. c. 121, § 26QQ (as amended through St. 1957, c. 150, § 1); § 26L (as amended through St. 1961, c. 496, § 1). St. 1964, c. 636, § 10.

positions.  Should the plaintiffs' contention as to disquali-
fication be accepted, a not unlikely result would be that all
the members of the council would be affected.  What we
consider the correct view was well expressed in *Wollen* v.
*Borough of Fort Lee*, 27 N. J. 408, where the votes of three
councilmen on the approval of a zoning plan were chal-
lenged because they publicly announced, when candidates
for election, how they would vote.  At p. 421 it was said:
"[T]his is the democratic process; and it would be con-
trary to the basic principles of a free society to disqualify
from service in the popular assembly those who had made
pre-election commitments of policy on issues involved in
the performance of their sworn legislative duties.  Such is
not the bias or prejudice upon which the law looks askance.
There is no showing that the minds of these councilmen
were not open to conviction in the just fulfillment of what
they severally conceived to be a solemn obligation to the
community.  Otherwise, representative democracy would
be subverted, and local self-government denied."  If the
decision of a lower court in *Saks & Co.* v. *Beverly Hills*,
107 Cal. App. 2d 260, is to the contrary we deem it uncon-
vincing and decline to adopt it.

Equally ineffective as a ground of bias against two coun-
cil members is the charge that they were beneficiaries of
campaign fund contributions related to this issue, and that
after the election each received from the defendant Hunter
a payment of $29 as his share in the unexpended balance
of the fund.  Contrary to the allegation in the bill, this was
not "compensation for their pledges."  In their brief the
plaintiffs make broad references to this being within the
prohibition of. G. L. c. 268A, §§ 3 and 17 (as appearing in
St. 1962, c. 779, § 1).  In the absence of an express state-
ment in the statute we shall not construe campaign contri-
butions as falling within these sections.  They carry heavy
penalties by fine and imprisonment and are derived from
legislation proposed by the Special Commission on Code of
Ethics, § 3 (e)–(i) and §§ 24–27.  See 1962 House Doc.
No. 3650, pp. 26–27, 38–39.  In specifying the scope of the

proposed legislation, the commission stated that it made the decision "not to include in the criminal section related subject matters such as . . . campaign contributions . . ." (p. 9).

A further charge of bias against a third member of the city council, Frederick C. Langone, arises from the allegation that "a member of his immediate family had a financial interest in the Government Center Area Project, in that such member of the family was conducting a funeral home in premises located in the Area, paying rent therefor, and seeking to relocate his business within the Area." This is based upon G. L. c. 268A, § 19 (a) (as appearing in St. 1962, c. 779, § 1).[1]

The present funeral home site is in the original project area, and not on State Street, as the plaintiffs concede in their brief. The statute is deficient in not containing a definition of "financial interest." 76 Harv. L. Rev. 1209, 1226–1227. The bill is not sufficiently definite to charge Langone with the commission of a criminal offence carrying severe penalties. It does not appear in the allegations that the Plan contains any reference to the funeral home. While the unnamed member of Langone's family may have a financial interest in subsequent decisions of the Authority, nothing discloses that such member had any financial interest in the approval of the Plan with or without Parcel 8.

4. A further contention in the bill is that "the Urban Renewal Plan submitted by the Authority was invalid and should not have been approved because [1] it did not conform to a general plan for the municipality as a whole and [2] was not sufficiently complete to indicate zoning and planning changes as required by G. L. c. 121, § 26ZZ.[2]

---

[1] "Except as permitted by paragraph (b), a municipal employee who participates as such an employee in a particular matter in which to his knowledge . . . his immediate family . . . has a financial interest, shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than two years, or both."

The definition of "immediate family" is given in c. 268A, § 1, as "the employee and his spouse, and their parents, children, brothers and sisters."

[2] Section 26ZZ states in part, "As used in sections twenty-six YY to twenty-six BBB, inclusive, an 'urban renewal plan' shall be construed to mean a plan, as it exists from time to time, for an urban renewal project, which plan (1) *shall conform to the general plan for the municipality as a*

There is no general plan for the City of Boston as a whole. The specifications in the Plan for the use of Parcel 8 violate the applicable zoning ordinances[1] of the City of Boston, but the Plan does not indicate the changes in the ordinances required.''

Significantly, there is no provision in c. 121 as to how a general plan is to be formulated, by whom, upon what notice, upon what if any hearing, what it shall contain, and many other details. The plaintiffs contend that the failure of the Plan to conform to a nonexistent general plan is jurisdictional. We do not agree. We construe that provision as requiring conformity only where there is such a general plan.

There is no allegation in case No. 6624 that the Project Plan does not conform to the Boston Center Business District Plan.[2] In cases Nos. 13,348, 13,349, and 6623 there are categorical allegations to that effect. These allegations are too vague to withstand demurrer and are argued in the plaintiffs' briefs only by way of assertion which does not call for consideration in this opinion.[3] *Lolos* v. *Berlin*, 338 Mass. 10, 13–14. *Grozier* v. *Post Publishing Co.* 342 Mass. 97, 101. *Vappi & Co. Inc.* v. *Aetna Cas. & Sur. Co.* 348 Mass. 427, 430.

---

whole, and (2) shall be sufficiently complete to indicate such land acquisition, demolition and removal of structures, redevelopment, improvements and rehabilitation as may be proposed to be carried out in the area of the urban renewal project, *zoning and planning changes, if any*, land uses, maximum densities, building requirements, and the plan's relationship to definite local objectives respecting appropriate land uses, improved traffic, public transportation, public utilities, recreational and community facilities, and other public improvements'' (italics supplied).

[1] There are no such ordinances. The reference must be to one of the zoning statutes for the city of Boston. St. 1924, c. 488, as amended through St. 1959, c. 193. St. 1956, c. 665, as amended through St. 1964, c. 244.

[2] There is no copy of that Plan before us. We are uninformed what may have been the source of such a plan if there is one. Even if we were so disposed and felt that we were authorized to pass upon the issue, it would not be possible for us to do so.

[3] In Boston the Authority constitutes the city planning board which must find that the project plan is based upon a local survey and conforms to a comprehensive plan for the locality as a whole. St. 1960, c. 652, § 12, second paragraph. G. L. c. 121, § 26ZZ, second paragraph (as amended through St. 1960, c. 776, § 7). An exclusive remedy for any person aggrieved by such a finding is provided by St. 1960, c. 652, § 13, final paragraph.

The objection that the Plan was not sufficiently complete to indicate zoning and planning changes is none too clear, especially when taken in connection with statements in State Street's pleadings in cases numbered 13,349 and 6623, where it is charged in identical language that the "Plan calls for erection of a tower building on Parcel 8 which cannot be less than 360 feet in height, but the existing zoning shown by the Plan for the locus imposes a maximum limitation of 155 feet." We construe this as meaning that the Plan shows both (a) that the intention is to erect a structure of not less than 360 feet and (b) that the existing permissible maximum height is 155 feet. This contention of the plaintiffs must fail.

We also note that the supposed requirement is but one matter enumerated in § 26ZZ respecting the completeness of a plan. We are not satisfied that there was any legislative intent to render nugatory all that may have been done on a project because of any omission to comply with this one feature. It is a matter of regret that at least this much of the plan is not available to our examination on demurrer as this would facilitate a decision.

5. We next consider the requirement of approval by the Division. In the bill the plaintiffs repeatedly allege that the Project is one of urban renewal. The Project is admittedly subject to § 26ZZ. This section is in the Housing Authority Law, Part VIII, which is entitled "Urban Renewal Projects." See St. 1955, c. 654, § 4. It provides for a hearing before the city council but none before the Division. Apparently to avoid the consequence of this omission the plaintiffs make the allegation of law that the Authority submitted its project to the Division for approval under both § 26ZZ and § 26KK. The latter section provides for a hearing by the Division but not for one by the council. In the absence of an express provision we shall not adopt a construction that the project is subject to § 26KK, which is in the Housing Authority Law, Part IV, entitled "Land Assembly and Redevelopment Projects." This interpretation is decisive upon the plaintiffs' case against the Divi-

sion. The plaintiffs were not deprived of any right to be told of, or to take part in, such a proceeding. No constitutional right was involved. See *Hayeck* v. *Metropolitan Dist. Commn.* 335 Mass. 372, 375, and cases cited.

6. The only prayer of the bill pertinent to declaratory relief is the fourth prayer for a decree that "the taking of the plaintiffs' property by the Authority, made on or about July 23, 1964, was illegal and a nullity." This prayer does not directly affect the bank or Hunter. Their demurrers were rightly sustained, because as to them the bill fails to state a controversy under the declaratory procedure. See *Weinstein* v. *Chief of Police of Fall River,* 344 Mass. 314, 317. On the demurrers of the other defendants it would have been better practice to overrule the demurrers and to make a negative declaration. See *Foley* v. *Springfield,* 328 Mass. 59, 62–63; *Vasilakis* v. *Haverhill,* 339 Mass. 97, 101; *School Comm. of New Bedford* v. *Commissioner of Educ. ante,* 410, 412.

7. Let the entries be made: The interlocutory decrees sustaining the demurrers of the defendant New England Merchants National Bank of Boston and of the defendant Hunter are affirmed. As to the other defendants the interlocutory and final decrees are reversed and a declaration is made that the taking of the plaintiffs' property by the Authority was not illegal and was not a nullity.

*So ordered.*

THE COMPANION CASES.

1. Case No. 13,348 is a petition for a writ of certiorari by State Street against the city council to quash the proceedings before it and to annul its approval of the Plan. The petitioner appealed from orders sustaining the demurrer and dismissing the petition. One ground of demurrer was in effect that the council's action was not subject to judicial review. There was no error. The council's decision was political. *Stacy* v. *Mayor of Haverhill,* 316 Mass. 759. *Clark* v. *City Council of Waltham,* 328 Mass. 40, 42. *Natick Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615, 617. *City Bank & Trust Co.* v. *Board of Bank Incor-*

*poration,* 346 Mass. 29, 32. *First Church of Christ, Scientist, in Boston, Mass.* v. *Alcoholic Beverages Control Commn. ante,* 273, 274. Also let it be noted that a petition for certiorari is addressed to the sound discretion of the court. *Loranger* v. *Martha's Vineyard Regional High Sch. Dist. Sch. Comm.* 338 Mass. 450, 459, and cases cited.

*Orders affirmed.*

2. Case No. 6622 is a bill in equity by State Street, purportedly under G. L. c. 268A, § 21 (as appearing in St. 1962, c. 779, § 1), against the city council, the Authority, the bank, and Hunter. Demurrers to the bill were sustained, one common ground being, in substance, failure to state a cause of action. The plaintiff appealed from interlocutory decrees sustaining the demurrers and from a final decree dismissing the bill. The matters alleged in the bill we have considered and rejected. We also have held that the bank and Hunter were not parties interested in those matters. We express doubt whether the plaintiff has any right of action under § 21, but do not feel required to rest our decision on that ground where no error appears.

*Decrees affirmed.*

3. Case No. 6623 is a petition by State Street, purportedly under G. L. c. 30A, § 14 (the State Administrative Procedure Act), against the Division to obtain a review of its decision approving the Project. The respondent demurred, one ground being lack of jurisdiction of the subject matter. The petitioner appealed from an interlocutory decree sustaining the demurrer and from a final decree dismissing the petition. There was no error. The decision was not "in an adjudicatory proceeding," which, as defined in c. 30A, § 1 (1), "means a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing." *Westland Housing Corp.* v. *Commissioner of Ins.* 346 Mass. 556, 557.

*Decrees affirmed.*

4. Case No. 13,349 is a petition for a writ of certiorari by State Street against the temporary director of the Division and the Authority, seeking review of the temporary director's determination in approving the Project. The Division is not made a party but, as the temporary director does not raise the question, we shall not discuss it. The prayer of the petition as concerns the temporary director is that "the approval of said Plan by the respondent Carney may be annulled." The prayer against the Authority is for an injunction against taking the petitioner's property by eminent domain. Both respondents demurred, one ground being that no case is stated in the petition. The petitioner appealed from orders sustaining the demurrers and from an order "denying" the petition.

The proceeding in so far as it concerns the Division or its temporary director must fail for reasons already considered by us. The prayer against the Authority falls with that against the Division or its temporary director.

*Orders affirmed.*

KIRK, J. (dissenting, with whom Spiegel, J., joins) My chief concern is the disposition made by the majority of the plaintiffs' "principal bill for declaratory relief" in so far as it relates to the Authority and to the bank. The majority hold that the Authority is entitled, on demurrer, to a declaration that the taking of the plaintiffs' property was legal, and that, as against the bank, no case has been stated which entitles the plaintiffs to relief.

On the record before us, I am unable to agree. The allegations which are fairly stated in the majority opinion present, I submit, a case which should be tried on the merits before final disposition is made. In summary, as I read the bill, it is alleged that the Authority, recognizing that its planned Government Center Project was in jeopardy because of the bank's opposition to the taking of its building, made a deal to appease the bank whereby, if private negotiations failed, the Authority would take the plaintiffs' building, which was not within the planned Project, so that the bank could continue in business at its existing building

pending the replacement of the plaintiffs' building by a tower structure to be erected by a developer selected by the bank. When completed, the first ten floors of the tower building were to be leased to the bank. The plaintiffs' property has, in fact, been taken by the Authority.

In essence the plaintiffs allege a scheme pursuant to which the Authority exercised its power of eminent domain as a device to take the plaintiffs' property for the use of the bank and not for any public agency included within the Government Center Project. The charge, it seems to me, requires a hearing on the merits rather than a disposition, based solely on a dilatory plea, which has the twofold effect of a final foreclosure of such a hearing and a binding determination of the rights of the parties. We are limited to the actual allegations of the bill. The Authority and the bank have chosen to stand on their demurrers and thereby admit those allegations. That there may be facts which justify the taking of the plaintiffs' building for the Project is beside the point. If there be such facts they are not before us in any form. There is no answer; there is no denial. There is no fact of which judicial notice may be taken which compels a determination that the taking was legal. The Authority and the bank should be held to the consequences of their pleadings and be required to go to trial as would any other litigant.

A few additional observations are in order. The opinion states that the plaintiffs' case does not fall within the illustration given by Chief Justice Qua in *Despatchers' Cafe Inc.* v. *Somerville Housing Authy.* 332 Mass. 259, 263. It could be said that the case in a strictly literal sense does not come within the specific illustration cited. I respectfully suggest, however, that the purpose of the taking, as here alleged, is more flagrant than anything suggested by the illustration in the *Despatchers' Cafe* case and is indistinguishable in principle. It is the taking by a public authority of land with building of private persons so that other private persons may construct, for their own use and benefit, a different building on the land taken.

I likewise suggest that the issue here presented is not, as

the opinion intimates, what were "the impelling motives of officers authorized to exercise the power of eminent domain," but rather is whether the Authority was "actually exercising that power for authorized purposes." I submit that on the pleadings, a case of the nature envisioned by Chief Justice Qua is now before us in aggravated form and should be dealt with.[1]

Other grounds relied upon by the majority to support their conclusions seem to me to be insubstantial. It is said, for example, that the acts and statements of the chief administrative officer of the Authority in connection with the taking are not attributable to the Authority. I find it difficult to reconcile this statement with what was said in *Costonis* v. *Medford Housing Authy.* 343 Mass. 108, 114–115. In any event, the question of the capacity of the chief administrative officer to act and speak for the Authority, if indeed it is controverted, could be and should be resolved at the trial and is not, in my judgment, either cumulatively or independently, sufficient reason for denying the plaintiffs a trial.

Similarly, the majority's statement that the position of the bank with respect to the proposed tower building is "no different legal position from that of any other prospective tenant" impresses me as unrealistic in view of the allegations that the bank stood athwart the original plan, participated in the arrangement for the taking of the plaintiffs' land, selected the developer who was to construct the new building on that land, and made an agreement for a lease of the first ten floors of the new building. If, on these allegations, the bank is not an indispensable party to the litigation, it should, in my opinion, be regarded at least as a proper and perhaps a necessary party as those terms are customarily applied. See *Minnesota* v. *Northern Sec. Co.* 184 U. S. 199, 235–236; *Franks* v. *Markson*, 337 Mass. 278, 283.

Transcending the effect of the holding of the majority in the present case are its implications for the future. On

---

[1] "It will be time enough to deal with such a case when it arises." Qua, C.J., in *Despatchers' Cafe Inc.* v. *Somerville Housing Authy.* 332 Mass. 259, 263.

the one hand, it is difficult to foresee how any landowner will ever have access to a forum to show that the power of eminent domain is being exercised for a private purpose by a public authority vested with that power. On the other hand, it is not difficult to conceive of situations wherein economically powerful private interests, shielded by the opinion of the majority and working behind the facade of a public authority which has the power of eminent domain, will be enabled to become the real beneficiaries of the exercise of that power in contravention of Article X of the Declaration of Rights of the Constitution of the Commonwealth.

For the reasons stated and to the extent indicated, I dissent from the disposition of the bill for declaratory relief. I would order that the demurrers of the Authority and the bank be overruled, that they be required to answer, and that the case proceed to trial with the least practicable delay.