Garsh, J.
The plaintiffs, owners of a parcel of property in New Bedford, Massachusetts known as Standard Times Field, commenced the present action against the City of New Bedford (the “City”) and the Executive Office of Environmental Affairs (“EOEA”) seeking compensation for an alleged regulatory taking of that property. This matter is now before the court on the cross-motions for summary judgment filed by the plaintiffs and by the City.[3] For the reasons discussed below, the plaintiffs’ motion for summary judgment is denied, and the City’s cross-motion for summary judgment is allowed.
BACKGROUND
The undisputed material facts as established by the summary judgment record are as follows:
Plaintiffs Vincent Grasso (“Grasso”) and Robert Regan (“Regan”) incorporated the Old New Bedford Waterfront Corporation (“ONBW”) to conduct the general business of real estate acquisition, investment, and development. On September 25, 1986, ONBW entered into a purchase and sale agreement to purchase a vacant waterfront parcel of land known as Standard Times Field (the “Parcel”) from Palmer’s Island Corporation for $2.7 million. The Parcel consists of “upland,” which is bounded by New Bedford Harbor, and “submerged land,” which runs under the harbor to Palmer’s Island. The plaintiffs intended to develop the Parcel, which was zoned as an “Industrial B” district, as a marina and waterfront park. They also considered the possibility of developing the upland with condominiums, which would require a zoning change to a “Mixed Use” district since residential uses are not permitted in an “Industrial B” zone. The plaintiffs expected to obtain the necessary zoning change because the Parcel had been vacant since the 1930’s; it was believed to be unsuitable for maritime industrial use due to a hurricane barrier, which effectively blocked direct access to the ocean, and shallow drafts between the upland and Palmer’s Island. The New Bedford Harbor Master Planning Study done in the 1970’s identified the Parcel as most appropriate for parks and beaches. That description continued in a draft New Bedford-Fairhaven Harbor Master Plan being developed at the time that the plaintiffs purchased the Parcel. The Parcel was free of oil and hazardous wastes. The plaintiffs anticipated permitting for all uses to be completed within two years of their purchase of the Parcel.
Pursuant to the federal Clean Waters Act, the City was required to upgrade its Fort Rodman wastewater treatment plant to meet federal secondary treatment effluent limitations.[4] To accomplish this, the City needed to construct a secondary wastewater treatment plant to work in tandem with the Fort Rodman plant. Federal funds were available to the City to study, plan, and build the secondary plant, but not to purchase or take by eminent domain private land on which to locate it.
ONBW closed on the purchase of the Parcel on December 30, 1986, financing the deal by executing a promissory note for $2.7 million to the Warren Five Cents Saving Bank (the “Bank”), secured by a mortgage on the Parcel in that amount.
Thereafter, on February 2, 1987, the City filed an Environmental Notification Form (“ENF”) with EOEA, the agency responsible for implementing the Massachusetts Environmental Protection Act (“MEPA”), G.L.c. 20, §§61-62H. The City’s ENF identified four possible locations for the secondary wastewater treatment plant. One of the alternative locations was the upland portion of the Parcel; another involved expansion of the existing Fort Rodman plant onto adjacent property.
The City’s Mayor, John Bullard, publicly opposed the development of the tidelands portion of the Parcel with a marina because it would make it more costly for the City to acquire the upland for a secondary wastewater treatment plant in the event that the upland were to be chosen as the site for the plant. In April of 1987, Mayor Bullard informed ONBW that the City was considering the Parcel as a potential location for its secondary wastewater treatment plant and requested that it delay development plans until the completion of the plant selection process.
Residents from the Fort Rodman neighborhood were adamantly opposed to siting the secondary plant at Fort Rodman. They formed highly active and influential citizen groups, including the Save Fort Rodman Committee and the South End Citizens Association. At all relevant times, these two groups opposed the marina project because they believed that it would increase the cost to the Cily of taking the Parcel for the treatment plant, making it more likely that the Fort Rodman site ultimately would be chosen.
On July 8, 1987, Grasso and Regan formed the Palmers Cove Limited Partnership (the “Partnership”); each was a 49.5% limited partner, and ONBW was the general partner and 1% limited partner. ONBW deeded its title and rights to the Parcel to the Partnership in exchange for the Partnership’s assumption of liability on the promissory note.
On August 27, 1987, ONBW filed an ENF for its waterfront park project with the EOEA.[5] The ENF described plans to construct a marina, harbor master’s house, public boardwalk along the water’s edge, two restaurants, a fifty room guest inn, 10,000 gross square feet of marine-related and commercial retail space, and 10,000 gross square feet of neighborhood retail space on the Parcel. The ENF further noted:
*291 This parcel is adjacent to a 22+ acre parcel which is currently scheduled for development (see attached site plan). The preferred development program for that parcel is residential with related amenities. However, at present, that parcel is zoned as Industrial B and will require rezoning to accommodate housing. The applicant desires to proceed at this time with the waterfront park project because: (1) the time frame for the residential rezoning has not been defined and (2) the waterfront park is financially and programmatically independent of the residential project (i.e. (a) marina slips are not associated with residential units, and (b) the waterfront park will be developed with or without the residential development). The applicant will submit a separate ENF for the remainder of the parcel at the appropriate time.
Thereafter, on September 30, 1987, Mayor Bullard wrote a letter to EOEA Secretary James Hoyle containing his official comments regarding ONBWs ENF. The Mayor wrote:
I have a major concern about this project’s timing relative to another that is in the planning stages. I am referring to the construction of a secondary wastewater treatment plant in the City of New Bedford . . . On January 30, 1987, the City filed an Environmental Notification Form . . . specifically naming that site as a possible location for our new wastewater treatment plant. . . with the final decision (excluding the approval process through DEQE and EPA) made by next spring.
While primarily concerned about the proposed project because of its timing, I am also equally concerned that the use proposed for what is the largest remaining undeveloped area within a designated port receive a comprehensive review. A comprehensive review cannot be made if the project continues in its current segmented state. It is very clear that the area proposed for development is connected with the land inland from the development. In fact only 14 acres of the proposed development are above the high water mark leaving 22 acres of land to be developed in a manner not mentioned.
Therefore, I am urging you to include within the scoping requirements for the Environmental Impact Report a condition that the Proponent fully address all development alternatives for that site. This should include:
1. A discussion of the Waterfront Park/Marina including alternatives if the remainder of the property remains industrially zoned;
2. A discussion of the Waterfront Park/Marina including alternatives if the remainder of the property receives a zoning change to residential;
3. A discussion of the Waterfront Park/Marina if the wastewater treatment plant were to occupy the remainder of the property; and
4.A discussion of an alternative if it were to be used only for the wastewater treatment plant with no Waterfront Park or Marina.
At this point and for the next several years the construction of a secondary treatment plant will remain the number one environmental priority of the City.
Also on September 30, the City’s Environmental Planner, Marcy Weatherbee, wrote a letter to the EOEA containing her official comments on the project. In addition to discussing issues such as wetlands, traffic and parking, and solid waste, Weatherbee stressed the importance of getting an EIRthat assessed the entirety of the proposed project, including likely future expansions. She wrote:
Old New Bedford Waterfront Corporation feels that their project does not conflict with "current federal, state and local . . . environmental plans and policies.” In fact, this is not the case at all. The “environmental plan” I am referring to is the construction of a secondary treatment plant in the City. The Proponent is fully aware of the fact that the City is considering that site for the location of treatment plant. The final siting decision will be made in the Spring of 1988. Their project, as proposed , directly conflicts with any plans the City may have for a treatment plant on the remainder of that site.
One of the general concerns I have relates to the severability of this project. The key can be located within 301 CMR 11 which states, “the entirety of a proposed project, including likely future expansions, shall be considered and not separate phases or segments thereof.” . . . Because the Proponent has the “intent” to develop the remainder of the property, and the fact that any impacts from future development cannot be easily separated, I am requesting that they be required to fully address all possible alternatives for the entire site. This should consist of a discussion of the current project including the residential project, the current project with an industrial portion, the current project with a wastewater treatment plant on the remainder of the site, and, perhaps, a scenario if the treatment plant were to occupy the entire site.
On October 13, 1987, pursuant to MEPA, EOEA issued a Certificate requiring ONBW to prepare an Environmental Impact Report for the waterfront park project. The Certificate stated:
There is disagreement whether this project, taken alone, constitutes segmentation, pursuant to 301 CMR 11.16. The pertinent facts, regarding the issue are as follows:
*the project described in the ENF . . . does have independent utility;
*292 *on the other hand, the project could potentially preclude or affect the choice of alternatives or mitigation for the remaining 22 acre parcel, because of the loss of direct access to the waterfront.
The importance of an analysis of alternative uses for the site has been clearly demonstrated. This site is in a Designated Port Area (DPA); however, the project proposal is inconsistent with the marine industrial designation. Moreover, this site is being actively considered by the Ci1y of New Bedford for a secondary wastewater treatment plant.
Based on these facts, it will be important to evaluate the potential effects from the entire project. A review process will be established whereby the Draft EIR is a planning document for the entire site. When the public review of the draft has been satisfied, it will be possible for the proponent to proceed with a Final EIR for the discrete phases of the entire project.
The Certificate thus required the scope of the EIR to include: 1) The “Preferred Alternative, as described in the ENF, and including the residential component for the 22 acre site”; 2) “A Maritime-dependent Industrial Project Alternative, which is consistent with the state’s Designated Port Area policies”; 3) “A Secondary Treatment Plant Alternative should be presented, based on the site assessment study that is being prepared for the City of New Bedford”; and 4) “Additional Alternatives that are a combination of elements of alternatives 1 and 2, and alternatives 1 and 3.”
With respect to the residential component for the 22 acre site, the Certificate noted that “in order for this proposal to proceed, a local zoning change will be necessary,” a proposition that was undisputedly accurate. Nothing in the Certificate required that the zoning change actually be obtained prior to completion of the EIR, or stated that EOEA approval would not be forthcoming for the marina were condominiums not permitted to be built on the upland. Indeed, the language describing “additional alternatives” makes it clear that ultimate approval of the marina was not tied to rezoning; EOEA pointed out that, at the scoping session, a representative of EPA had observed that a waterfront park and marina are not necessarily incompatible with industrial uses. The plaintiffs chose not to challenge the validity of any part of the Certificate.
ONBW employed experts to conduct a wetland resources study and met with the City’s Shellfish Constable, the Commonwealth’s Division of Marine Studies, the EPA, the U.S. Army Corps of Engineers, and the Division of Wetlands and Waterways of the Commonwealth’s Department of Environmental Protection (“DEP’j to develop mitigation measures for the proposed work on eight identified wetland resource areas in the Parcel. ONBW also commissioned a study of the navigation impacts of the proposed marina, including detailed harbor traffic counts and a wave and wake analysis incorporating weather and wind data. Further, it commissioned detailed engineering studies analyzing the Parcel’s suitability for diverse maritime dependent industrial uses, and its suitability for the proposed condominiums, including community economic benefits and fiscal impacts of the condominiums, a comprehensive marina needs analysis, and a comprehensive automobile traffic count with proposed mitigation measures.
On December 4, 1987, ONBW filed an application with the City Council to amend the zoning of the Parcel from Industrial B to Mixed-Use Business in order to permit the condominium project. New Bedford’s Planning Board (the “Board”) was required to review the petition and make a nonbinding, advisory recommendation to the City Council Ordinance Committee. In connection with ONBW’s petition, the Board received a letter from the South End Business Association opining that, although the proposal would economically benefit the City, rezoning should be postponed until the City determined the exact location of its waste treatment plant.
New Bedford City Planner and Planning Board Chairman also wrote to the Board concerning the wisdom of changing the classification from Industrial B to a use which would allow retail, commercial, and industrial use. He questioned whether the Parcel was “the most appropriate site for residential use being bracketed on the north and south by heavy industrial uses” and whether, as part of a Massachusetts Coastal Zone Management Designated Port Area, the Parcel was “suitable for commercial and retail uses of a non waterfront dependent nature.” He answered the questions he had raised with the statement, “[t]he Planning Department thinks not,” while adding that the Department was open to be convinced through a thoughtful analysis of alternative uses for the site. He also pointed out that the plaintiffs’ EIR for the Parcel could be used as a planning tool to aid decision making bodies such as the Planning Board. He concluded that neither the planning Department nor the Planning Board had sufficient data to make an informed recommendation and, thus, the existing zoning should be deemed best suited to the City’s needs.
On February 17, 1988, the Board held a public hearing on ONBW’s petition. City Councilor and Planning Board Member Daniel Hayes opined that the rezoning petition was premature and stated:
How can I be expected to vote tonight when we have a letter from our own Planning Department stating that we have insufficient evidence? ... I have no problem with the entire parcel, in fact I would like to see it go ahead, but I think we have to wait for the site of the plant, the people in this City will have to pay forever (a sewer user tax), wherever the plant goes will certainly be hardship cost. So we have to make sure, that is what I am saying.
*293 In addition, the President of the South End Civic Association read into the minutes, on behalf of four hundred residents, a letter opposing the rezoning which argued that a rezoning was premature since the area was under consideration as a site for the secondary sewage treatment plant. The Association pointed out that “premature zoning could cost the City much more to acquire this land if it were selected as the sewage treatment plant site.” At the close of the meeting, the Board voted unanimously to refer the rezoning petition to the City Council Ordinance Committee without a recommendation.
The City Council Ordinance Committee held a public hearing on ONBWs petition on March 17, 1988. At this time, ONBW withdrew its petition and promised to work cooperatively with the City until the wastewater treatment plant siting decision was made, but requested that the Council do whatever it could to speed up the siting process. ONBW did not commence a suit challenging the validity of the Industrial B zoning classification as applied to the Parcel.
Thereafter, in June of 1988, ONBW submitted its Draft EIR[6] to the EOEA, with copies provided to various City officials, including the Planning Department. During early August of 1988, the New Bedford Seafood Dealers Association, the Offshore Mariners’ Association, the New Bedford Chamber of Commerce, and the publisher of the Standard-Times wrote letters to the EOEA supporting ONBWs proposed development of the Parcel, as did abutters United Social Club and Cape Cod Sportswear Co., City Council President James Sullivan, Councilor John Saunders, State Representatives Joseph McIntyre and Denis Lawrence, and State Senator William McLean, Jr.
On August 11, 1988, New Bedford’s Environmental Planner wrote a letter to the EOEA criticizing the Draft EIR, but not on the grounds that development of the marina would increase the expense of eminent domain should part of the Parcel be taken for the treatment plant. She wrote as follows:
The Proponent states “Although the project site is of sufficient size to accommodate the treatment plant, insufficient buffers exist between the site and adjacent residential properties and other uses . . .” The proponent’s conclusions are premature, if not totally incorrect. The detailed environmental evaluation of WWTP site alternatives is scheduled for completion by December 1988. The level of analyses of the WWTP alternative conducted by the Proponent is insufficient to draw the conclusions presented . . . The proponent fails to provide any objective analysis of the economics of the project and instead has described this alternative in terms of “public costs.” Again, the conclusions of this analysis are premature.
The following week, on August 19, 1988, the EOEA issued its Certification stating that the Draft EIR complied with MEPA and its implementing regulations. It noted, however, as follows:
The alternatives analysis ... is a missed opportunity. The discussions in the Draft EIR lead to the conclusion that the proposed project is superior to other possible alternatives. At this stage of the review these conclusoiy discussions are premature. Since alternatives have been deemed unrealistic, impact analyses have been dismissed, leaving reviewers at somewhat of a loss, particularly since the site is being actively considered for public projects.
This approach could interfere with creative solutions to conflicting interests for the development of the Palmer’s Cove site. The Final EIR should take into account the serious comments on the alternatives analysis and should be more forthcoming in the analysis of site options. For example, even if the proponent is not interested in a mixed use proposal, such as a waterfront park/marina and wastewater treatment plant, the Final EIR should evaluate the potential for and impacts of such a mixed development.
The Certificate also found no meaningful assessment of the issues relating to the Parcel being part of a Designated Port Area. EOEA observed that even though the site had been vacant for many years, the potential for future uses could not be written off, noting that at least two water related industrial uses at the site were being contemplated, namely the wastewater treatment plant and a disposal site for contaminated dredging materials. The Certificate also raised several questions which were required to be answered in the final EIR concerning the plaintiffs’ dredging plans. Once again, the plaintiffs did not mount a legal challenge to EOEA’s requirement that the final EIR contain an analysis of site options for the entire Parcel or to anything else contained in the Certificate.
From August until December 1988, ONBW met with state and city officials to discuss the requirements of the Final EIR. ONBW learned at these meetings that condominiums could only be allowed on the upland if that property were “de-designated” from the New Bed-ford/Fairhaven Port Area, and that only the City could apply for such a de-designation.[7] When ONBW emphasized that it wanted to proceed with only the marina portion of the project, EOEA advised that the marina was ineligible for a Chapter 91 license because it would extend beyond the New Bedford harbor line.[8]
To remedy the chapter 91 problem, ONBW petitioned the Legislature to alter the boundary of the New Bedford Harbor Line. The New Bedford Chamber of Commerce, the publisher of the Standard-Times, the New Bedford Harbor Development Commission, the Mayor’s Economic Development Office, and City Councilor James Sullivan wrote letters to the Legisla *294 ture supporting legislation that would accomplish what ONBW was seeking.
On February 20, 1989, Mayor Bullard publicly announced that he had selected Fort Rodman as the site for the secondary wastewater treatment plant. However, City Council approval was needed to raise the taxes to fund the plant, remove federal deed restrictions on the land containing Fort Rodman, and approve the local permits needed for construction of the plant.
As quoted in the Standard-Times in June of 1989, City Councilor Ralph Saulnier opposed legislation altering the boundary line of the harbor for the following reason:
If this bill passes, will the property become more valuable? Does that rise in value then make it impossible for us to afford to take the land if we need it? ... I think it would be foolish to allow this bill to go any further until we have more information ... If that plant has to go at the Standard-Times Field, are we going to force the taxpayers of this city to pay more for this property than they should?
City Councilor Nelson Macedo was quoted as stating, “I think any site that is being considered as a back-up site shouldn’t be touched." Councilor-at-large Daniel Hayes was quoted as stating, “Certainly this bill will enhance the (value of) the Standard-Times Field . . . We owe it to every concerned party, the mayor, the City Council, to get the best information we can about this legislation.”
In July of 1989, ONBW filed a Notice of Intent with the New Bedford Conservation Commission and an application with the DEP Wetlands and Waterways Division for a Chapter 91 license for dredging and the construction of a marina, boat slips, fueling station and a travel lift pier. On July 23, 1989, the Save Fort Rodman Committee wrote to Governor Dukakis asking him to defer signing legislation changing the harbor boundary line, stating:
Fort Rodman and the land affected by SB 1131, known as Standard-Times Field, have been chosen by our Mayor as potential sites for a secondary wastewater facility. We feel that both properties should remain status quo, since the sites are currently being considered, reviewed and analyzed by federal and state agencies, and the final decision for the plant has yet to be made. We feel, however, that the owners of the Standard-Times field through enactment of SB 1131, have taken action to increase the value of their land. We believe this would place a further burden on the taxpayers of the city of New Bedford if the Standard-Times field is chosen as the site and eminent domain proceedings must be instituted.
Enclosed with this letter was a statement signed by nine City Councilors requesting the Governor not to sign Senate Bill 1131 until the Committee on Natural Resources could conduct an advertised public hearing in New Bedford and the City Council had the opportunity to formally take a position on the legislation. Unlike the letter from the Save Fort Rodman Committee, the letter from the Councilors does not ask the Governor not to sign the bill because it might increase the cost to the Cily should eminent domain proceedings be instituted.
On August 8, 1989, Governor Dukakis recommended that the legislation be amended as follows: “This act shall take effect upon a final written determination by the Department of Environmental Protection that the upgraded wastewater treatment facilities for the City of New Bedford will be sited at a location other than the Standard Times Field site.” The Governor stated that he was recommending such language for the following reasons:
[M]y concern has to do with the upland parcels that the bill affects. The upland parcels of land, known as the Standard Times Field, is the proposed alternative site for the upgrading of New Bedford’s sewage treatment facilities . . . Should these facilities be required to be located at the Standard Times Field site, this legislation as currently drafted could result in a substantial increase in the cost to New Bedford’s ratepayers and the Commonwealth’s taxpayers.
The legislation amended in the way that the Governor proposed.
On August 22, 1989, the New Bedford Conservation Commission issued an Order of Conditions to ONBW for the dredging and construction of the marina. DEP’s Wetlands and Waterways Division did not take jurisdiction of the Order of Conditions. The same day, the Director of Massachusetts Coastal Zone Management wrote a memorandum to the EOEA stating that “we should be cautious in the state’s support for any private development projects in New Bedford until we have a better sense of where the two treatment facilities will be located. My main interest is for protecting the ratepayers of the city and the taxpayers of the Commonwealth.” An internal DEP memo dated August 30, 1989 stated that it “would be desirable to wait as long as possible before making the determination mentioned in the amendment [to Senate Bill 1131]. It is possible that a final decision about the siting won’t be made until the spring of next year.”
In October of 1989, ONBW filed an application with DEP for a Water Qualiiy Certificate for dredging. On October 24, 1989, City Councilor Ralph Saulnierwrote to the EOEA, reminding it that the City had not yet made any decision about the site for the Wastewater Treatment Plant because the City Council had not endorsed the mayor’s selection.
In November, ONBW filed an application.with the Department of the Army for a federal permit for the marina project.[9] On December 26, 1989, Mayor Bullard wrote to the EOEA requesting, on behalf of the *295 City of New Bedford, the de-designation of the Parcel from the New Bedford-Fairhaven Designated Port Area.
In January of 1990, ONBW once again filed a petition with the City Council to rezone the Parcel known as the Standard-Times Field from Industrial B to a Mixed-Use Business District. The Planning Board held a public hearing on February 6, 1990, during which Mayor Bullard and City Planner Alfred Lima recommended approval of the petition. The Chairwoman of the Save Fort Rodman Committee and City Councilor Ralph Saulnier spoke in opposition to the petition. The Planning Board voted unanimously to recommend approval of the petition.
On February 2, 1990, the Mayor again requested that EOEA approve de-designation. On February 8, 1990, the Save Fort Rodman Committee wrote to the EOEA opposing the City’s request to de-designate the Parcel from the port area, stating: “We feel that this designation will increase the value of the land at the Standard-Times Field if the City is required to fake said land through an eminent domain proceeding.”
On February 15, 1990, the City Council Ordinance Committee held a hearing on ONBW’s rezoning petition. After denying a continuance sought by ONBW, the Committee voted eight to two against the rezoning.
On February 20, 1990, EOEA ruled on the City’s request for de-designation by stating that, pursuant to MEPA, such a request required the preparation of an EIR.
Thereafter, on March 5, 1990, the EOEA rejected the City’s Facility Plan for the secondary wastewater treatment plant as incomplete, stating that it failed to comply with MEPA, in part, because it failed to adequately delineate proposed mitigation of community impacts at Fort Rodman. By letter dated March 12, 1990, the New Bedford City Council notified the EOEA that it “would not be supportive of any actions that might minimize or eliminate the use of the Standard-Times Field as a site for the secondary/primary sewage treatment plant for the City of New Bedford.”
In April of 1990, Mayor Bullard challenged the City Council to vote on a final site for the treatment plant. A simple majority of six votes was needed to choose a site, while eight votes were needed to lift the deed restrictions on Fort Rodman. Meanwhile, on April 11, 1990, the Bank notified ONBW that it was in default on its loan for the Parcel. On May 1, 1990, the City Council voted six to five to approve the ranking of the Fort Rodman Site first and the Standard Times Field second for the siting of the secondary wastewater treatment plant.
The following day, the Standard-Times reported City Councilor Saulnier as stating that he intended to use deed restrictions on the Fort Rodham land to block constructing the plant there. The Bank sent ONBW a notice of intent to foreclose on September 27, 1990, and, on October 19, 1990, ONBW filed for Chapter 11 Bankruptcy, temporarily staying the foreclosure. On November 26, 1990, EOEA issued its Certificate on the City’s Supplemental Final Environmental Impact Report, stating that “several outstanding issues remain ... including the relocation of existing facilities at Fort Rodman.”
The Bank foreclosed on the Parcel on August 28, 1991, with ONBW owing substantial deficiencies. The controversy over the siting of the wastewater treatment plant continued long after the foreclosure.
There never was an order of taking pertaining to the Parcel. The City did not physically occupy or invade the plaintiffs’ land or otherwise cause any physical injury to the Parcel.
The present action alleges that the concerted actions of the City, the EOEA, and other state actors with respect to the Parcel constituted inverse condemnation in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and Article 10 of the Massachusetts Declaration of Rights.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
ONBW and the City both agree that there are no material facts in dispute. Each contend that it is entitled to judgment as a matter of law based on the summary judgment record.
The Fifth Amendment to the United States Constitution prohibits the taking of private property for public use without just compensation. Similarly, Article Ten of the Massachusetts Declaration of Rights states whenever an individual’s properly is appropriated for public use, he shall receive reasonable compensation therefor. When the claim is that government conduct, not amounting to a permanent physical occupation or confiscation of property, constitutes a regulatory taking, the analysis is peculiarly fact dependent, involving ad hoc, factual inquiries. Daddario v. Cape Cod Commission, 425 Mass. 411, 416 (1997); *296 Steinbergh v. Cambridge, 413 Mass. 736, 741 (1992), cert. denied, 508 U.S. 909 (1993).
The plaintiffs advance various theories in support of their contention that a regulatory taking of the Parcel occurred for which the City must provide fair compensation.
I. TAKING BASED ON THE ALLEGED FAILURE OF THE CITY’S ACTIONS TO SUBSTANTIALLY ADVANCE LEGITIMATE LAND USE INTERESTS
Regulatory action amounts to a taking if it fails to substantially advance a legitimate state interest. Greenfield Country Estates Tenants Ass’n, Inc. v. Deep, 423 Mass. 81, 86 (1996); Steinbergh, supra, 413 Mass. at 744. The plaintiffs contend that the City’s actions with respect to the Parcel constitute a compensable taking because they did not substantially advance the City’s legitimate land use interests. The actions at issue are 1) the City’s inducing EOEA to impose an unduly burdensome scope on the EIR for the marina project, including consideration of alternatives involving the construction of condominiums and the placement of the City’s wastewater treatment plant on the Parcel’s uplands;[10] 2) the City’s inducing EOEA to condition ONBW’s state and federal permits for the marina project on the rezoning of the Parcel as well as on the de-designation of the site as a port area and on the change in the harbor line, and then inducing the Governor to condition the harbor line change on the Parcel’s not being chosen as a site for the City’s treatment plant; and 3) the City’s denial of ONBW’s petition to rezoné the Parcel from Industrial B to' Mixed-Use Business.
The burden is on the landowner to demonstrate that the challenged regulatory actions do not meet the constitutional standard of substantially advancing the government’s legitimate land use interests. Lopes v. Peabody, 417 Mass. 299, 307 n. 13 (1994); Steinbergh, supra, 413 Mass. at 745. The test is not one of strict necessity; rather, what is required is an “essential nexus” between the City’s interests and its chosen means, a logical and sufficiently well-founded approach to dealing with the problem faced by the City. Id. at 746-47.
A. Scope of the EIR
EOEA is not a municipal agency. Whether the scope of the EIR dictated by EOEA substantially advanced legitimate land use interests is relevant only if the plaintiffs have demonstrated that the City was responsible for the EOEA’s scoping decision with respect to the marina project. They have not.[11]
The fact that the scoping requirements imposed by the EOEA are in conformity with those recommended by the City in its official comments does not, without more, warrant an inference that the City is responsible for the actions of the EOEA. See, e.g., Wolfman v. Board of Appeals of Brookline, 15 Mass.App.Ct. 112, 120, rev. denied, 388 Mass. 1104 (1983) (the fact that developers submitted a draft decision to the zoning board, which may have relied on the draft in writing its decision, does not, standing alone, constitute a showing of lack of independent analysis by the Board).
There is no evidence in this record that the City is responsible for the decision by the EOEA, an independent state agency charged with environmental protection, to impose the EIR scope that it did.[12] Accordingly, the City cannot be held liable for a taking based on the scoping determination of the EOEA, notwithstanding that the City may have urged the broad scope ultimately imposed. See Municipal Light Co. of Ashburnham v. Commonwealth, 34 Mass.App.Ct. 162, 170, rev. denied, 415 Mass. 1102, cert. denied, 510 U.S. 866 (1993) (Commonwealth’s opposition to a power plant based on public health and safety concerns did not constitute a regulatory taking where the state has not and cannot regulate that plant and its activities were confined to the role of an advocate before those Federal agencies which can and do regulate it). See also Hamilton v. Conservation Commission of Orleans, 12 Mass.App.Ct. 359, 369 (1981) (where the decision of a local authority denying a project was superseded by an order of the DEQE denying the project, the DEQE, and not the local authority, is liable for any taking which results).
B. Conditioning Permits
To the extent that the plaintiffs claim that the City induced EOEA to condition federal permits, there is no evidence in the record which supports that contention. Similarly, there is no evidence that EOEA conditioned its approval of the marina project on the rezoning of the upland portion of the Parcel to permit the construction of condominiums; even if the Certificate for the EIR could be so construed, there is no evidence that the City is responsible for the EOEA’s imposing such a requirement. Similarly, there is no evidence that the City is responsible for how the state chose to construe state regulations applying to designated port areas or for how the state chose to construe a state statute, G.L.c. 91. The law governing port areas substantially advances land use interests. To the extent that it may have been inappropriately applied to ONBW, and there is no such showing, it was the State and not the City that acted improperly, actions which ONBW chose not to challenge. Indeed, with respect to de-designation, the Mayor twice sought the de-designation desired by ONBW.
With respect to ONBW’s argument that the City induced the Governor to condition the change in the harbor line on the upland not being selected as the site for the treatment facility, the plaintiffs have not established that the City is responsible for the amendment to the statute such that liability may be imposed on the City for that amendment. The only action of the City in connection with the legislation is a letter sent to Governor Dukakis, signed by nine City Councilors, *297 requesting that the Governor not sign the harbor line bill until the City Council was able to hold a public hearing on the matter and adopt a formal position on the legislation.[13] That letter did not ask that the legislation not take effect until the DEP determined that the treatment plant would not be located on the Parcel. By contrast, taxpayer groups such as Save the Fort Rodman Committee actively lobbied the Governor that the status quo not be changed until there was a final siting decision. The plaintiffs have no credible evidence that the legislation was amended to condition the change in New Bedford’s harbor line requested by ONBW on a final written determination of the siting of the wastewater treatment plant as the result of lobbying by city councilors as opposed to lobbying by New Bedford taxpayers and voters. Accordingly, the City is not liable for a regulatory taking, if any, based on the refusal to change the harbor boundary line. Municipal Light Co. of Ashburnham, supra, 34 Mass.App.Ct. at 170.
C. Denial of Rezoning Petition
Finally, the plaintiffs contend that the City’s denial of ONBW’s January 1990 rezoning petition constituted a regulatory taking because it failed to substantially advance a legitimate state interest. In examining a decision to rezone, a court may look to the information available to the City at the time it acted. Steinbergh, supra, 413 Mass. at 746-47.
The Industrial B zoning classification had been in effect for decades before the plaintiffs purchased the Parcel. There is no contention that the City took the affirmative step of spot-zoning the Parcel in order to prevent the plaintiffs from constructing condominiums on the upland. Instead, the gravamen of the plaintiffs’ claim is that the City improperly failed to change the zoning classification to accommodate the plaintiffs’ desire to use the Parcel in a more economically beneficial way.
A zoning classification is constitutionally valid unless it is clearly arbitrary and unreasonable with no substantial relation to the public health, safety, morals, or general welfare. Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). See also Sturges v. Chilmark, 380 Mass. 246, 256 (1980). The decision as to whether the public interest mandates a change in the zoning ordinance is not governed by any stricter standards.
“[T]he main purpose of zoning is to stabilize the use of property and to protect an area from deleterious uses . . .” Enos v. Brockton, 354 Mass. 278, 280 (1968). Once adopted, “zoning regulations are intended to have a certain degree of permanency, as evidenced by the fact that they are more difficult to amend than most other by-laws and ordinances.” Id. At 281. In deciding whether to change an existing zoning classification, a city may consider the good of the city as a whole and future land use needs in addition to present conditions and use. Rosko v. Marlborough, 355 Mass. 51, 53 (1968). Lanner v. Board of Appeal of Tewksbury, 348 Mass. 220, 229 (1964); ACW Realty Management, Inc. v. Planning Board of Westfield, 40 Mass.App.Ct. 242, 247 (1996). “Plainly ... it is proper . . . [for the City] to take into account the probable future development of the entire region.” Wilbur v. Newton, 302 Mass. 38, 42 (1938).
The court’s role in review of zoning enactments is limited and every presumption is made in favor of the by-law. “[I]f its reasonableness is fairly debatable, it will be sustained.” Sturges, supra, 380 Mass. at 256. The plaintiffs have a heavy burden of showing a conflict with applicable constitutional provisions.
The plaintiffs emphasize that the City Council Ordinance Committee did not place on the record reasons for denying their rezoning petition. However, when the rezoning was first discussed in 1987, the City Planner and Planning Board Chairman had questioned, inter alia, whether the Parcel was “the most appropriate site of residential use being bracketed on the north and south by heavy industrial uses.” There is nothing to suggest that the uses in the areas surrounding the Parcel had changed in the interim. At that stage, for numerous reasons, the plaintiffs had not yet secured permission from the EOEA to construct a marina. The DEP had also not yet determined that the City’s upgraded wastewater treatment facilities would be sited at a location other than the Standard Times Field site, and thus no chapter 91 permit was forthcoming. The state had not allowed the dedesignation request. The Parcel was the largest remaining undeveloped area within a designated port and there is no evidence that condominiums on the upland conformed to any comprehensive plan then in effect. When ONBW petitioned for a zoning change in 1990, EOEA had not yet approved ONBW’s final EIR. EOEA’s Certificate had raised several concerns about the thoroughness of the draft EIR.
In denying a petition to change the zoning law, a municipality is not restricted to the arguments which were advanced before it voted. Id. The plaintiffs have failed to prove that the challenged classification bore no rational relationship to any permissible public object which the City may plausibly be said to have been pursuing. The requested rezoning was not part of a rezoning in conjunction with a far larger area following the adoption of a new master plan. There is no evidence that the Parcel was singled out for different treatment from that accorded surrounding land, producing classifications that failed to treat like properties in a uniform manner. A zoning classification is not unconstitutional merely because the owner of the land might have more profitably used the premises for some purpose not permitted by the existing zoning ordinance or bylaw.[14]
In sum, the plaintiffs have failed to meet their heavy burden of demonstrating that the City’s refusal to rezone did not substantially advance its legitimate *298 interest in maintaining the longstanding zoning status of the Parcel.
II. TAKING BASED ON THE CITY’S ALLEGED PURPOSEFUL ATTEMPT TO DEPRESS THE PARCEL’S VALUE
ONBW also argues that, even if the denial of its petition could be justified by some legitimate land-use interests, nonetheless the denial effected a taking because the real reason the City voted to deny the petition was to depress the Parcel’s property values in order to minimize the cost of acquisition of the property should the wastewater treatment plant be located there.[15] The City’s argument that the plaintiffs fail to state a claim because eminent domain proceedings never were instituted against the Parcel misses the point. Admittedly, an announcement that the government intends to take a particular parcel of land for public use does not itself constitute a taking even though such an announcement decreases the value of the property and the government subsequently fails to execute the taking. Cayon v. Chicopee, 360 Mass. 606, 610 (1971). In such a case, changes in the property’s value are deemed to be “no more than incidents of ownership ...” Id. The decreased value of the property that may follow from being the subject of an announcement that a taking is likely is the unavoidable by-product of a legitimate, good-faith exercise of the government’s power of eminent domain. Plaintiffs do not, however, complain about the fact that the value of their property may have been depressed by the announcement that the City was considering siting the treatment plant on the Parcel.
Instead, the plaintiffs seek relief for what they claim was inverse condemnation arising out of a governmental entity purporting to exercise its police power through zoning, but actually intentionally acting to discriminate against a particular parcel of private land with the wrongful purpose of depressing its value so that it could be taken cheaply in eminent domain. ONBW alleges that the decline in property value was not unavoidable, but rather the deliberate and intended result of the City’s attempt to take its property without paying full and just compensation. Courts have recognized such a cause of action. See, e.g., Orlando/Orange County Expressway Authority v. W&F Agrigrowth-Fernfield, Ltd., 582 So.2d 790, 792 (Fla. App.), rev. denied, 591 So.2d 183 (1991) (taking occurred where county used a “recorded reservation map” to impose a development moratorium on plaintiffs property for the sole purpose of depressing the land’s value in anticipation of eminent domain proceedings); Business Ventures, Inc. v. Iowa City, 234 N.W.2d 376 (1975) (zoning ordinance subject to collateral attack in condemnation proceeding where owner’s application for rezoning consistently tabled pending determination of park commission’s acquisition plans); California v. Southern Pacific Transportation Co., 33 Cal.App.3d 960, 965 (Cal.App. 1973) (where zoning applied by city to subject property was the implementation of a city policy to frustrate, by discriminatory spot zoning, development of discontinued railroad rights-of-way for other than street purposes, collateral attack upon zoning permitted); In re Crosstown Expressway, 281 A.2d 909, 913-14 (Pa. 1971) (complaint alleged that, after announcing an intent to take certain parcels of land for a highway project, the state urged the city of Philadelphia “to impede private development of properties within the proposed route”).[16]
In order to prevail on the merits of such a claim, ONBW must demonstrate that the City abused its legitimate powers by intentionally taking actions respecting the Parcel for the specific purpose of depressing its value. In re Virginia Park, 328 N.W.2d 602, 606 (Mich.App. 1982). In addition, the plaintiff bears the burden of proving that the government’s actions were a substantial cause of the decline of the property’s value. Id. See also Heinrich v. City of Detroit, 282 N.W.2d 448, 450-51 (Mich.App. 1979). The plaintiffs failed to produce evidence that would satisfy these requirements.
A. Scope of the EIR
As discussed above, the plaintiffs are unable to prove that the City’s official comments on ONBW’s Draft EIR were a substantial cause of the EOEA’s scoping decision and thus the City cannot be held liable for any decline in the value of the Parcel as the result of that decision. Furthermore, the plaintiffs have not established that the City’s comments to EOEA constituted an abuse of its legitimate power intended to reduce the value of the Parcel so that the City might be able to acquire it cheaply in the future. The Mayor’s letter to the EOEA detailed,' inter alia, concerns having nothing to do with the timing of the project, concerns that were related to the fact that the Parcel was the largest remaining undeveloped area within a designated port. The comments by the City’s Environmental Planner similarly stress the need for a comprehensive review for reasons unrelated to saving the City funds should it need to appropriate the Parcel. The optimal use of the largest undeveloped waterfront property in the City was an obvious and entirely legitimate municipal concern.
B. Change in the Harbor Line
The plaintiffs next contend that the City acted wrongfully and intentionally to reduce the Parcel’s value by inducing the Governor not to sign the harbor line change legislation without an amendment conditioning the redrawing of the harbor line on the DEP’s final determination that the wastewater treatment facility would be located at a location other than the Parcel. For the reasons discussed above, the plaintiffs have failed to establish the requisite causation to impose liability for a taking on the City in connection with that state executive and legislative action.
*299 Moreover, the plaintiffs have not demonstrated that the City acted with the intent to depress the Parcel’s value for purposes of a possible future eminent domain proceeding in connection with its activities concerning the amendment. They emphasize statements by City Councilor Ralph Saulnier to the effect that he would seek to delay enactment of the harbor line bill because its passage would increase the value of the Parcel, making it more expensive for the City to take it by eminent domain for the treatment plant. But the letter sent to Governor Dukakis that was signed by nine City Councilors does not make that argument; it simply requests that the Governor not sign the bill until the City Council was able to hold a public hearing on the matter and adopt a formal position on the legislation. An improper motive should not be attributed to a city if there are valid reasons that would have supported the city’s action, especially when the action at issue is undertaken by a majority vote of members of a board of public officers who cannot act separately or individually. Pheasant Ridge Associates Ltd. Partnership v. Burlington, 399 Mass. 771, 775, 777 (1987). See also Moskow v. Boston Redevelopment Authority, 349 Mass. 553, 564 (1965), cert. denied, 382 U.S. 983 (1966). A municipality is not bound by the statements of individual officials not made as part of the action of a municipal board, nor are such statements admissions that may be used against the town. Id. Saulnier’s statements were not made in connection with official action by the City Council concerning the harbor line boundary change and thus cannot be imputed to that body. The plaintiffs have not met their heavy burden of demonstrating that the City acted in bad faith with respect to the harbor line change. See Arrigo v. Planning Board of Franklin, 12 Mass.App.Ct. 802, 811, rev. denied, 385 Mass. 1107 (1981) (where the subjective motivation of a municipal board is relevant, the plaintiff bears the burden to show any impropriety).
C. Denial of Rezoning Petition
ONBW also argues that the City’s denial of its rezoning petition, even if ostensibly done to regulate land usage in the public interest, constitutes a taking because the real purpose the City Council acted was to depress property values in order to minimize the costs of acquisition of the Parcel.[17] The plaintiffs point to the statements of various taxpayer groups opposing ONBW’s rezoning petition because it would make it more costly for the City to take the Parcel. Where the issue is whether action taken by a legislative body is valid or reasonable, the private views, desires, or motives of individual citizens are immaterial. Barrett v. Building Inspector of Peabody, 354 Mass. 38, 43 (1968) (evidence that the Cily Council received petition signed by 1,016 voters favoring a zoning change is not relevant to the validity of the zoning action taken). Accordingly, the motive of individual taxpayers or citizen lobby groups is not probative of the City Council’s purpose in denying the zoning petition at issue.
The plaintiffs further argue that the Planning Board’s recommendation in 1990 that the petition be approved makes clear that the City Council must have been motivated by a desire to depress the value of the property when it denied the petition. However, where a zoning amendment is at issue, the evidence heard by a planning board, which does no more than make an advisory recommendation, is not material. Wallace v. Building Inspector of Woburn, 5 Mass.App.Ct. 786, 787 (1977) (rescript).
The plaintiffs also point to the fact that, in connection with the 1988 Planning Board hearing on ONBW’s initial zoning petition, the Standard-Times quoted five city councilors as stating that they were not in favor of the proposed rezoning because it would increase the value of the Parcel. Such statements, however, were not made in connection with official board action. See Moskow, supra, 349 Mass. at 564. Moreover, such statements were made two years before the action at issue. Finally, the plaintiffs point to the statements of City Councilors Saulnier and Kruger to the effect that they opposed the zoning change because it would increase the value of the Parcel if the City were to acquire it for the treatment plant. However, the motive of the City Council, acting as a body, cannot be derived from the expressions of a particular councilor. See Boston Water & Sewer Comm’n v. Metropolitan District Comm’n, 408 Mass. 572, 578 (1990) (statements of individual legislators as to their reasons for acting on legislation are not an appropriate source from which to discover the intent of the legislation). While these two councilor’s statements may be indicative of their individual motives in voting against the rezoning, such statements are not probative of what motivated the other councilors who voted against the rezoning. Cf. Simon v. Needham, 311 Mass. 560, 566 (1942) (where a town board advanced certain unsound or insufficient reasons in recommending the passage of a zoning amendment, the court should not assume that, in approving the amendment, the voters at town meeting were motivated by the improper reasons advanced).
Moreover, nothing the City did or did not do in failing to rezone in 1990 — whatever its motives— amounted to inverse condemnation. At that stage, the EOEA had not yet approved the final EIR[18] and, thus, the plaintiffs have not demonstrated that condominiums could have been built on the upland even if the Parcel had been rezoned. Rezoning was a condition prerequisite to construction of the condominiums, but not to obtain approval of the EIR. Further, to the extent that de-designation by the state was required before any condominiums could be constructed, that de-designation had to come from the state and it had not. The City had officially sought de-designation in December of 1989 and again in February of 1990. Finally, although there is evidence that the plaintiffs would *300 have constructed the marina if permitted to do so by the state and federal governments even in absence of permission to construct condominiums, there is no evidence whatsoever that ONBW would have constructed condominiums on the upland in this heavily industrial area of the City if not permitted to go forward with the marina. When the City declined to rezone the Parcel, the DEP had not determined that the upgraded wastewater treatment facilities for the City would be sited at a location other than the Parcel and thus ONBW could not get a permit under chapter 91 to construct the marina.[19]
In sum, the plaintiffs have failed to establish a claim of inverse condemnation based on affirmative actions by the City discriminating against the Parcel with the wrongful purpose of depressing its value with a view to future takings in eminent domain.
III. TAKING BASED ON ALLEGED DEPRIVATION OF ECONOMIC USE OF PARCEL
Finally, the plaintiffs contend that they are entitled to judgment on the ground that the cumulative joint actions of the City, the EOEA, and the New Bedford taxpayers prohibited all economically viable use of the Parcel, thus constituting a categorical taking for which they must be compensated. Government regulations may deprive an owner of the most beneficial use of its property without rendering the regulation a taking for which compensation is required. Daddario, supra, 425 Mass. at 416-17. “Land use planning is not an all-or-nothing proposition. A government entity is not required to permit a landowner to develop property to [the] full extent he might desire or be charged with an unconstitutional taking of the property." Id. at 417, quoting, MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 347 (1986).
However, a regulation which goes “too far” by prohibiting all economically viable use of the property constitutes a categorical taking which is compensable without case-specific inquiry into the public interest sought to be advanced. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015-16 (1992); Steinhergh, supra, 413 Mass. at 741. Regulations which “leave the owner of land without economically beneficial or productive options for its use — typically ... by requiring land to be left substantially in its natural state — carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm.” Lucas, supra, 505 U.S. at 1018. Even a temporary loss of all economically viable use of private property may constitute a compensable taking. First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304 (1987); Steinbergh, supra, 413 Mass. at 741-42 & n. 6.
As discussed above in connection with the plaintiffs’ alternative takings theories, the plaintiffs have failed to demonstrate that the City caused the EOEA to decide as it did with respect to the scope of the EIR, caused the legislation to be amended so that the harbor line change would not take effect until after the DEP had issued a written determination that the wastewater treatment facilities would not be sited at the Parcel, or caused the state not to de-designate the Parcel. The Ciiy is not liable for the decisions made by these other entities. See Municipal Light Co. of Ashburnham, supra, 34 Mass.App.Ct. at 170.
Plaintiffs fare no better with their contention that the City’s denial of ONBW’s 1990 petition to rezone the Parcel deprived them of all economically beneficial use of the Parcel. The plaintiffs bear the burden of proving both that the City’s action deprived them of all economically beneficial use of the Parcel and that the use desired was otherwise permitted under various other regulations. Lopes v. Peabody, 417 Mass. 299, 306-07 (1994).
The denial of ONBW’s petition to rezone affected only ONBW’s ability to develop one part of the Parcel, the upland-. “ Taking’ jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.” Moskow v. Commissioner of Environmental Management, 384 Mass. 530, 533 (1981). Thus, restrictions on a landowner’s right to construct condominiums on his properly is not necessarily a regulatory taking if the property as a whole retains substantial value. Daddario, 425 Mass. at 416. Plaintiffs have made no showing that condominiums were economically viable on the upland in the absence of the marina. Indeed, the plaintiffs bought the Parcel primarily because of its potential to be developed into a marina and marine related uses. They believed that with a marina, even if condominiums could not be built, the value of the upland would be substantially enhanced. Thus, it was not the failure to rezone that deprived ONBW of all economically beneficial use of the Parcel. ONBW had no demonstrated interest in taking advantage of the rezoning, should its petition have been granted, nor has it shown that it would have been economically viable to have done so, in the absence of permission for the marina to be developed. There is no evidence that the City’s failure to rezone had any impact upon the state’s failure to take the actions that were necessary for the marina to be built. Plaintiffs have also not demonstrated that the use that would have been permitted had its petition to rezone been allowed would otherwise have been permitted under nonzoning regulations.
Furthermore, where, as here, a landowner purchases property subject to a particular land use restriction, he cannot complain about the loss of a right he never had. When the plaintiffs bought the parcel, they were aware that it was not zoned for condominiums because residential uses were not allowed within an Industrial B district. A property owner’s investment-backed expectations must be reasonable, pred *301 icated on existing conditions, and more than a unilateral expectation or an abstract need. Leonard v. Brimfield, 423 Mass. 152, 155, cert. denied, 117 S.Ct. 582 (1996). The plaintiffs acquired the Parcel when the zoning classification was already in effect.
In sum, the plaintiffs have failed to demonstrate a compensable regulatory taking by the City.
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs’ motion for summary judgment be DENIED and that the defendants’ cross-motion for summary judgment be ALLOWED.

On October 21, 1994, this Court (O’Brien, J.) entered judgment on the pleadings in favor of EOEA on the ground that the plaintiffs had no cause of action against that agency for a regulatory taking because they had failed to timely challenge EOEA’s Environmental Impact Report scoping determination.

The Fort Rodman plant is located on land in the South End of the City in Ward 6.

Under MEPA, before any state agency can issue a permit for a proposed development project, the EOEA must determine, after consulting with all interested parties, whether a comprehensive environmental impact report (“EIR”) is required and, if so, must determine the form, content, level of detail, and alternatives required for the report and must limit the scope of the report to those issues which, by the nature and location of the project, are likely to cause damage to the environment, and, if no financial assistance from the agency is sought, to those issues which are within the subject matter jurisdiction of the permit. Villages Development Co. v. Secretary of the Executive Office of Environmental Affairs, 410 Mass. 100. 102 (1991), citing G.L.c. 30, §62A; 301 Code Mass. Regs. §11.06.

The draft EIR contained 155 pages of text plus numerous lengthy exhibits.

There is no evidence that the advice given to ONBW regarding the necessity of de-designation was given in bad faith. ONBW at no time sought declaratory relief with respect to the necessity of de-designation.

G.L.c. 91, the Waterways Permit and License Program, is designed to protect the Commonwealth’s interests in navigable waters. Under c. 91, a license from the DEP is required for any construction or filling activity in or over tide waters below the high water mark. See c. 91, §§14-18.

There is nothing in this record that demonstrates that such permits were ever granted.

The plaintiffs failed to challenge the EOEA’s scoping decision. Exhaustion of administrative remedies is not a prerequisite to assertion of a takings claim where the landowner accepts the correctness of a decision under the relevant statutory and administrative scheme but alleges that the regulatory decision constitutes a compensable taking. Hamilton v. Conservation Comm’n, 12 Mass.App.Ct. 359, 374 (1981). Here, however, ONBW claims that EOEA’s scoping decision was improper because it required consideration of alternatives, including the condominium project and the wastewater treatment plant. See Wilson v. Commonwealth, 413 Mass. 352, 356 (1992) (landowners generally cannot challenge land use regulations as a taking until they exhaust administrative processes which might eliminate the taking).

Although the City did not dispute the plaintiffs statement of undisputed facts in the form of a lengthy affidavit by plaintiff Vincent Grasso, many paragraphs in that affidavit contain conclusory assertions bearing on causation that are not based on the affiant’s personal knowledge; since they are not appropriately part of an affidavit, they shall be disregarded. Post v. Commissioner of the Department of Environmental Quality Engineering, 403 Mass. 29, 35 n. 8 (1988) (“[sjtatements of conclusions are not appropriately part of an affidavit from a nonexpert”); Madsen v. Erwin, 395 Mass. 715, 721 (1985). Further, to the extent that the underlying documents fail to support the affiant’s characterization of them, the court does not accept such characterizations.

Moreover, the scoping decision substantially advanced legitimate land use interests. Given the fact that the Parcel was the largest remaining undeveloped area within a designated port, although plaintiffs may have wanted to develop it in stages, it fostered legitimate environmental interests for the EOEA to require that the EIR consider the Parcel as a whole and for the City to encourage the EOEA to do that.

The Save Fort Rodman Committee also sent the Governor a taxpayer petition opposing the location of the treatment plant at Fort Rodman on a variety of grounds. That petition had been signed by seven City Councilors.

Furthermore, if the existing zoning ordinance as applied to the plaintiff did not substantially advance legitimate state interests and the City was required, as a matter of law, to grant the request for a zoning change, Nectow v. City of Cambridge, 277 U.S. 183 (1928), ONBW had the opportunity to obtain a judicial determination of the invalidity of the existing zoning ordinance. G.L.c. 240, §14A. Any landowner may “petition for a decision concerning the validity or invalidity of any zoning restriction applicable to his land.” Sturges, supra, 380 Mass. at 249. ONBW chose not to do so. The plaintiffs no longer own the land. “The Supreme Court of the United States has generally denied landowners the right to challenge land use regulations as takings until they have shown that available legal processes, not yet used, will not eliminate the alleged taking.” Wilson v. Commonwealth, 413 Mass. 352, 356 (1992), citing MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 351 (1986); Wüliamson County Regional Planning Comm’n v. Hamilton Bank, 473 U.S. 172 (1985). This is not a situation in which the plaintiffs accept the legal validity of the action allegedly giving rise to the taking, but seek compensation. Accordingly, for the same reason that the plaintiffs cannot obtain relief against EOEA because of their failure to commence an action under G.L. 231 A, it appears that they should not be able to proceed against the City on the grounds that the City had no reason to continue to apply the Industrial B classification to the Parcel.

The City is correct that the type of delay which commonly occurs in government-imposed processes, such as regulatory approvals or changes in local by-laws, have not traditionally been viewed as constituting regulatory takings. Steinbergh v. Cambridge, supra, 413 Mass. at 743; Wilson v. Commonwealth, 413 Mass. 352, 355 (1992). But see id. at 355-56 (concluding that an allegation that improper delay in the regulatory process caused the total destruction of plaintiffs’ property stated a takings claim). However, the thrust of the plaintiffs’ complaint is that the City took action to deliberately prevent development of the Parcel, not that the delay, in and of itself, constitutes a taking.

Massachusetts decisions have also suggested that, in some cases, eminent domain proceedings may be invalid because of the bad faith or improper motive of the government, such as where eminent domain power is used solely to benefit a private person or for the sole purpose of preventing the developer’s intended low income housing project. See Benevolent & Protective Order of Elks v. Planning Board of Lawrence, 403 Mass. 531, 551 (1988); Pheasant Ridge Asso *302 ciates, Ltd. Partnership v. Burlington, 399 Mass. 771, 775-76 (1987).

At the time when the City Council voted to deny the petition to rezone, the Mayor had already selected Fort Rod-man as his choice for the treatment plant. Within three months of its denial of the petition, the City Council voted 6 to 5 to approve siting the facility as Fort Rodman.

Indeed, there is no evidence in the record that EOEA ever approved the final EIR.

There is no evidence that ONBW had received the necessary federal permits to construct the marina.